UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Corbett,<br><br>                                        Plaintiff,<br><br>                 v.<br><br>Kathleen Hochul, *in her official capacity as chief executive of the State of New York*<br><br>                                        Defendant. | No. 22-cv-5867 (LGS)(SDA) |

## GOVERNOR KATHY HOCHUL'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION  FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
17th Floor
New York, NY 10005
*Attorney for Governor Hochul*

TODD A. SPIEGELMAN
Assistant Attorney General
     *of Counsel*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL BACKGROUND ......................................................................................... 4

FACTUAL BACKGROUND……………………………………………………………………..9

ARGUMENT ............................................................................................................ 12

    I.    PLAINTIFF LACKS STANDING TO SUE ............................................... 12

    II.    THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS ......................... 17

    III.    PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................................. 19

        **A.**    **The Challenged Requirements Are Constitutional Under the Bruen Test** 20

        1.    Background Checks to Determine Dangerousness Are Endorsed by Bruen and Follow Longstanding Anglo-American Traditions............................................. 21

        2.    The Social Media Requirement Is Critical to Determining Whether an Applicant Will Use a Weapon only in a Manner That Does Not Endanger Oneself or Others............................................................................................. 26

        3.    The Training Requirements Are Consistent with the Second Amendment ....... 29

        **B.**    **Plaintiff's First Amendment Challenge Fails Because the Social Media Disclosure Provision Passes Intermediate Scrutiny** ..................................... 33

    IV.    PLAINTIFF HAS NOT MADE A STRONG SHOWING OF IMMINENT AND IRREPARABLE HARM ......................................................................... 36

    V.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT PUBLIC SAFETY ............................................................. 37

    VI.    CONCLUSION    ……………………………………………………………38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Able v. United States*,
   44 F.3d 128 (2d Cir. 1995)..................................................................................12

*Adam v. Barr*,
   792 F. App'x 20 (2d Cir. 2019) ...........................................................................15

*Antonyuk v. Bruen*,
   No. 22-cv-0734, ECF No. 48 (N.D.N.Y. Aug. 31, 2022)................................. *passim*

*Aron v. Becker*,
   48 F. Supp. 3d 347 (N.D.N.Y. 2014).............................................................18, 19

*Bill & Ted's Riviera, Inc. v. Cuomo*,
   494 F. Supp. 3d 238 (N.D.N.Y. 2020).................................................................12

*Bogan v. Scott Harris*,
   523 U.S. 44 (1998).............................................................................................19

*Brooklyn Brands LLC v. Ethan Lieberman*, No. 18-cv-7245,
   2018 WL 10246003 (E.D.N.Y. 2018)..................................................................37

*Citizens Union of the City of N.Y. v. Attorney General of N.Y., No. 16-cv-9592*,
   2017 WL 2984167 (S.D.N.Y. June 23, 2017) .....................................................19

*Corbett v. City of New York*,
   160 A.D.3d 415 (1st Dep't 2018), *lv. denied*, 31 N.Y.3d 913 (2018) ....................11

*Corbett v. City of New York*,
   816 F. App'x 551 (2d Cir. 2020) .........................................................................11

*Corbett v. City of New York*,
   No. 158276/16, 2017 WL 550191 (Sup. Ct. N.Y. Cty. Feb. 7, 2017) .............. 10-11

*Corbett v. City of New York*,
   No. 18-cv-7022 (KPF), 2019 WL 2502056 (S.D.N.Y. June 17, 2019) ............. 10-11

*Davis v. N.Y.*,
   316 F.3d 93 (2d Cir. 2002)..................................................................................17

*Dickerson v. Napolitano*,
   604 F.3d 732 (2d Cir. 2010)................................................................................20

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)................................................................................ *passim*

*Dube v. State Univ. of N.Y.,*
    900 F.2d 587 (2d Cir. 1990).......................................................................17

*Dukakis v. Dep't of Defense,*
    686 F. Supp. 30 (D. Mass. 1988) ...............................................................32

*Dwyer v. Farrell,*
    193 Conn.7 (Conn. 1984)...........................................................................6

*Ex parte Young,*
    209 U.S. 123 (1908).............................................................................17-19

*Gras v. Stevens,*
    415 F. Supp. 1148 (S.D.N.Y. 1976)............................................................19

*In re Dairy Mart Convenience Stores, Inc.,*
    411 F.3d 367 (2d Cir. 2005)........................................................................18

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and
    Fourth Departments,*
    852 F.3d 178 (2d Cir. 2017).......................................................................15

*JN Contemporary Art LLC v. Phillips Auctioneers LLC,*
    472 F. Supp. 3d 88 (S.D.N.Y. 2020)...........................................................36

*Joglo Realties, Inc. v. Seggos,*
    No. 16-cv-1666, 2016 WL 4491409 (E.D.N.Y. Aug. 24, 2016) .............................36

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) (Barrett, J. dissenting)..............................21, 24, 26

*Kwong v. Bloomberg,*
    723 F.3d 160 (2d Cir. 2013)........................................................................31

*L&M Bus Corp. v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,*
    No. 18-cv-1902, 2018 WL 2390125 (E.D.N.Y. May 25, 2018)...............................11

*Li v. Lorenzo,*
    712 F. App'x 21 (2d Cir. 2017) ..................................................................19

*Libertarian Party of Erie County v Cuomo,*
    970 F.3d 106 (2d Cir. 2020)................................................................... *passim*

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).............................................................................................13

*Marino v. Twn. of Branford,*
    No. 17-cv-1828, 2018 WL 691715 (D. Conn. Feb. 2, 2018)..................................14

*Maryland v. King,*
    567 U.S. 1301 (2012)..........................................................................................38

*Mastrovincenzo v. City of N.Y.,*
    435 F.3d 78 (2d Cir. 2006).............................................................................. 34-35

*Mendez v. Heller,*
    530 F.2d 457 (2d Cir. 1976)................................................................................18

*Mullins v. City of N.Y.,*
    626 F.3d 47 (2d Cir. 2010)..................................................................................23

*N.Y. State Rifle & Pistol Assoc. v. Bruen,*
    142 S.Ct. 2111 (2022) ................................................................................ *passim*

*N.Y.S. Motor Truck Ass'n v. Pataki,*
    No. 03-cv-2386, 2004 WL 2937803 (S.D.N.Y. Dec. 17, 2004) ............................19

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) .....................................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009)............................................................................................12

*NYSRPA v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) abrogated in part on other grounds, Bruen, 142
    S.Ct. 2111 (2022).........................................................................................15, 34

*Oneida Indian Nation v. U.S. Dep't of Interior,*
    336 F. Supp. 3d 37 (N.D.N.Y. 2018)...................................................................13

*Osterweil v. Bartlett,*
    819 F. Supp. 2d 72 (N.D.N.Y. 2011), vacated on other grounds by 738 F.3d
    520 (2d Cir. 2013)...............................................................................................18

*Our Wicked Lady LLC v. Cuomo,*
    No. 21-cv-165, 2021 WL 915033 (S.D.N.Y. Mar. 9, 2021)..................................38

*Patterson v. Cty. of Oneida, N.Y.,*
    375 F.3d 206 (2d Cir. 2004)................................................................................18

*Pena-Rodriguez v. Colorado*,
    137 S.Ct. 588 (2017)............................................................................23

*People ex. rel. Schneiderman v. Actavis PLLC*,
    787 F.3d 638 (2d Cir. 2015)................................................................12

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)................................................................36

*Seminole Tribe of Fla. v. Fla.*,
    517 U.S. 44 (1996)..............................................................................17

*Shipping Fin. Servs. Corp. v. Drakos*,
    14 F.3d 129 (2d Cir. 1998)..................................................................13

*Sibley v. Watches*,
    501 F. Supp. 3d 210 (W.D.N.Y. 2020)...............................................18

*State Emps. Bargaining Coal. v. Rowland*,
    494 F.3d 71 (2d Cir. 2007)..................................................................19

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)............................................................................12

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................................15

*Tedards v. Ducey*,
    398 F. Supp. 3d 529 (D. Ariz. 2019) ..................................................16

*Thomas v. Martin-Gibbons*,
    857 F. App'x 36 (2d Cir. 2021) ..........................................................19

*Time Warner Cable Inc. v. FCC*,
    729 F.3d 137 (2d Cir. 2013)................................................................34

*Time Warner Cable v. Bloomberg L.P.*,
    118 F.3d 917 (2d Cir. 1997)................................................................36

*Trotman v. Palisades Interstate Park Comm'n*,
    557 F.2d 35 (2d Cir. 1977)..................................................................17

*United States v. Jackson*,
    No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. August 18, 2022)...................25

*United States v. Jimenez*,
    No. 15 Cr. 496, 2016 WL 8711451 (S.D.N.Y. June 3, 2016) (Schofield, J.) .........34

*United States v. Miller*,
    307 U.S. 174 (1939)................................................................30

*United States v. Salerno*,
    481 U.S. 739 (1987)........................................................20, 28

*Wang v. Pataki*,
    164 F. Supp. 2d 406 (S.D.N.Y. 2001)...................................19

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................34

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)............................................................11, 37

**UNITED STATES CONSTITUTION**

First Amendment ...................................................... *passim*

Second Amendment ................................................... *passim*

Eleventh Amendment................................................ 2, 17-19

Art. I § 8 cl. 12......................................................................29

**FEDERAL STATUTES**

42 U.S.C.
    § 1983.....................................................................................17

**STATE STATUTES AND REGULATIONS**

Pa. Cons. Stat.
    § 6109(d)(3) .............................................................................7

Cal. Penal Code
    § 26165 (a)(3), (c) .................................................................31

Colo. Rev. Stat.
    § 18-12-203(2) ....................................................................8, 22

Concealed Carry Improvement Act ........................... *passim*

Del. Code
    § 1441(2)................................................................................21

Ill. Comp. Stat. 66/75................................................................31

Ill. Comp. Stat. Ann. 66/10(a)(4) ..................................................................8, 22

Md. Code Regs. 29.03.02.03(B)(5) ....................................................................22

1806 N.J. Laws 536, 565 ...................................................................................30

N.M. Stat. Ann.
    § 29-19-7 ...................................................................................................31

N.Y. Exec. Law
    § 223(1) .....................................................................................................16

1779 N.Y. Laws 239 ..........................................................................................30

1781 N.Y. Laws 445 ..........................................................................................32

N.Y. Penal Law
    § 265.00(10) .............................................................................................13
    § 400.00(1), (3) ........................................................................................13
    § 400.00(1)(b) ..........................................................................7, 22, 24
    § 400.00(1)(o)(ii) .................................................................8, 26, 35
    § 400.00(1)(o)(iii) ......................................................................................9
    § 400.00(1)(o)(iv) ...............................................................................9, 35
    § 400.00(19) ........................................................................................9, 16

New York's Sullivan Law .....................................................................................5

Or. Rev. Stat Ann.
    § 166.291(4) .............................................................................................22

Va. Code
    § 18.2-308.09(13) .......................................................................................7

Alaska Admin. Code
    § 30.070(a)(1)(A) ......................................................................................31

N.J. Admin. Code
    § 13:54-2.4 ...............................................................................................22

OTHER AUTHORITIES

Application for a Pennsylvania License to Carry Firearms, available at
    https://bit.ly/3zJtWaC ...............................................................................22

Cambridge Dictionary, Cambridge University Press (2022) ...............................22

David C. Williams, <u>Civic Republicanism and the Citizen Militia: The Terrifying</u> <u>Second Amendment</u>, 101 Yale L.J. 580 (Dec. 1991) ...............................................32

Florida Department of Law Enforcement, Unreported Information Showing [Shooter]'s Troubling Behavior, available at https://bit.ly/3zEdPuZ ......................................28

Gabrielle Fonrouge, <u>Twisted diary of alleged Buffalo shooter . . . reveals his</u> <u>online radicalization</u>, N.Y. Post, May 17, 2022, available at https://bit.ly/3CCqWjw.............................................................................36

Patrick J. Charles, <u>Armed in</u> <u>America: A History of Gun Rights from Colonial</u> <u>Militias to Concealed Carry</u> 156 & n.219 (2018) .....................................24

Peter H. Lindert and Jeffrey G. Williamson, <u>American Incomes Before and After</u> <u>the Revolution,</u> 73 J. of Econ. Hist. No.3, 725, 742 & table 3 (Sept. 2013)..........................30

Press Release on passing of CCIA, July 1, 2022, available at https://on.ny.gov/3BM6Hz7 ...............................................................6

6 <u>The Statutes at Large of</u> <u>Pennsylvania From 1682 to 1801,</u> at 319-20 (WM Stanley Ray 1899) .............................................................................23

Sutherland Statutory Construction § 47:28...............................................22

Travis Caldwell, et. al, Online Posts reveal suspected gunman spent months planning racist attack at Buffalo supermrket, cnn.com, available at https://cnn.it/3djje36 ......................................................................28

Thomas Greenleaf, <u>Laws of the State of New York, Comprising the Constitution, and the Acts of</u> <u>the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive</u> 230 (1792)………………………………………………………………………... 29-32

7 William W. Hening, <u>The Statutes at Large, Being a</u> <u>Collection of all the Laws of</u> <u>Virginia</u> 35-36 (Richmond: Franklin Press, 1809) ...............................................23

9 William W. Hening, <u>The Statutes at Large, Being a Collection of all the Laws of</u> <u>Virginia</u> 281 (1821)............................................................................24

Defendant Kathy Hochul, in her official capacity as Governor of New York State ("Governor"), respectfully submits this memorandum of law with the accompanying Declaration of Todd A. Spiegelman ("SD") and the exhibits thereto, in opposition to Plaintiff Jonathan Corbett's motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

The recent mass shootings at a grocery store in Buffalo, a parade in Highland Park, Illinois, and an elementary school in Uvalde, Texas, demonstrate that gun violence continues to plague New York and our nation. To address the ongoing crisis and to comply with the Supreme Court's decision in *N.Y. State Rifle & Pistol Assoc. v. Bruen,* 142 S.Ct. 2111 (2022), the State of New York enacted the Concealed Carry Improvement Act ("CCIA" or the "Act"), which amended New York's laws related to concealed carry licenses by requiring applicants to make certain disclosures that allow a licensing officer to assess whether the applicant would use a weapon consistent with his or her right to self-defense or in a dangerous and irresponsible manner. The Legislature firmly grounded each provision of the Act in the rulings of the *Bruen* Court, and in centuries of law and tradition prohibiting arms or disarming people or groups considered dangerous.

Despite this, Plaintiff moves for a preliminary injunction against key sections of the CCIA, including the requirements that applicants submit character references, list their recently used social media accounts, and complete two firearms safety training courses. He claims these reasonable provisions violate the Second Amendment as interpreted in *Bruen*. But Plaintiff

---

[1] Defendant's memorandum of law is 38 pages. On September 1, 2022, Defendant filed a letter motion with the Court requesting an increase in the page-limit from 25 to 50 pages and an increase in the number of permitted exhibits from 15 to 30. ECF No. 13. The latter request is moot because Defendant submits 14 exhibits herewith.

misreads that decision, which expressly endorsed statutes that, like the CCIA, "require applicants to undergo a background check or pass a firearms safety course . . . to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S.Ct. 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

The Court need not reach these constitutional questions, however, because Plaintiff's motion—and the underlying action—fail at the outset for lack of standing. Plaintiff has no injury fairly traceable to the Governor because, as Plaintiff admits, the New York City Police Department ("NYPD") is the local licensing officer which is currently reviewing the application Plaintiff submitted for a concealed carry license, not the Governor. Under controlling Second Circuit precedent, any injury from a future denial of Plaintiff's application may be fairly traced only to the local licensing officer, and not any other official. Plaintiff also lacks standing because he fails to plead that the CCIA requirements he challenges will cause him an injury-in-fact. Plaintiff submitted his application to the NYPD, which has not completed its review, let alone denied Plaintiff's' application because of the CCIA's newly enacted requirements.

The Governor is also immune from this lawsuit under the Eleventh Amendment. The *Ex parte Young* exception to Eleventh Amendment immunity permitting prospective, injunctive relief against a state official applies only where such official has some connection to the enforcement of the Act, and here, the Governor has none. In fact, Plaintiff has sued the City of New York twice before for denying him a gun license, not the Governor.

If the Court reaches the merits of Plaintiff's lawsuit, it should conclude that the complaint fails to state any viable claim. Although Plaintiff claims the character reference and social media disclosure requirements are standardless, he ignores that under the CCIA, licensing officers

2

review these disclosures only to determine whether the applicant is of good moral character such that he or she would not use a weapon in a dangerous manner. *See* N.Y. Penal Law § 400.00(1)(b). The good moral character standard was upheld by the Second Circuit, and the Supreme Court endorsed similar standards in *Bruen*. 142 S.Ct. at 2123 n.1. The disclosure requirements also fall comfortably into a long line of historically analogous public safety restrictions prohibiting the provision of arms to—and requiring the disarmament of—persons found to be dangerous. New York's requirement that a licensing officer consider an applicant's character references and his or her public social media activity is a sensible modern analogue to those established precedents, satisfying the *Bruen* test under the Second Amendment. Further, the training requirements that Plaintiff objects to are contemplated in the Constitution itself (and in the text of *Heller* and *Bruen*) and pale in comparison to the training done for militia service at the time of the Founding.

Plaintiff's First Amendment claim is similarly unavailing because the social media disclosure requirement clearly serves a substantial government interest in protecting New Yorkers from people with clear indicia of dangerousness. The requirement is narrowly tailored to that objective inasmuch as it is only triggered when someone voluntarily applies for a license, only requires disclosure of social media accounts going back three years, and does not require the disclosure of non-public postings. It survives Plaintiff's facial challenge as it plainly has constitutional applications. Time and time again, gunmen who commit mass murder post disturbing content on social media and tell friends and family about their plans before they start shooting and even before they attempt to legally acquire weapons. It is not difficult to foresee the social media disclosure requirement saving the lives of innocent people, which is surely a

3

constitutional application of the law.

Lastly, Plaintiff is not suffering from any injury, let alone an irreparable, imminent one, because the NYPD has not decided his application and, according to Plaintiff, will not do so until next year. Indeed, the NYPD may deny his application for reasons having nothing to do with the CCIA, as it has done previously. The equities clearly weigh against him and heavily in favor of New York and its duty to keep weapons out of the hands of those who would use them aggressively to kill or harm others.

Accordingly, the common-sense provisions of the CCIA that protect the lives of all New Yorkers are constitutional and should be upheld.

## LEGAL BACKGROUND

### A. *District of Columbia v. Heller* and *N.Y. State Rifle & Pistol Assoc. v. Bruen*

In *Heller*, 554 U.S. at 628-29, the Supreme Court ruled that a District of Columbia statute banning the possession of handguns in the home violated the Second Amendment. In *Bruen*, the Supreme Court expanded on the Second Amendment protections it recognized in *Heller*, declaring that in addition to "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." 142 S.Ct. at 2122.

The *Bruen* Court also took issue with the two-step analysis that had been adopted by each of the federal Circuit Courts after *Heller*, finding that step one—wherein a court determines if the government has proven the regulation does not infringe on the right of self-defense—was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. But the Court found that step two, wherein a court applies

means-end scrutiny to regulations that infringe on Second Amendment rights, was "one step too many." *Id.* The Court summarized its ruling as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2129-30. The "plain text" of the Second Amendment protects the "right to 'bear' arms in public for self-defense." *Id.* at 2135. Thus, if a law infringes on that right, a court will consider Anglo-American history to determine its constitutionality. Importantly, in cases that require historical analysis, the government need only identify a "historical analogue" to the challenged regulation that is "relevantly similar" to it, not a "historical twin." *Id.* at 2132-33.

Applying this test, the Court found that a single provision of New York's gun licensing regime was unconstitutional: the requirement that an applicant demonstrate "proper cause" to obtain a license to carry a concealed weapon, *i.e.*, a showing of specific threats or attacks against the applicant. *Id.* at 2123.  The Court held that requiring such a heightened, individualized need for self-defense violated the right of a law abiding, responsible citizen to carry a handgun for self-defense. *See id.* at 2122, 2123 n.1; *see also id.* at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this [self-defense] purpose. That is all we decide.").  The Court did not address any other provision of New York's licensing law or related statutes.

The Court also made clear that "nothing in our analysis should be interpreted to suggest

the unconstitutionality of . . . 'shall-issue' licensing regimes," which "often require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 142 S.Ct. at 2138 n.9 (cleaned up). It found such measures permissible because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Although some "shall-issue" licensing laws "have discretionary criteria," the Court found that appropriate because these standards are aimed at excluding "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* at 2123 n.1 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12 (1984)). Notably, the Court endorsed the discretionary criteria of the licensing laws in these "shall issue" regimes without conducting a historical analysis. *Cf. id.* at 2162 (Kavanaugh, J., concurring) (discussing the well-established categories of gun regulation set forth in the *Heller* opinion and emphasizing that such measures are "presumptively lawful.").

## B. The CCIA

On July 1, 2022, the CCIA was passed by the New York State Legislature in extraordinary session, then signed into law by Governor Kathy Hochul. The bill was specifically designed "to align with the Supreme Court's recent decision in []*Bruen*," *see* Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7, eliminating the requirement that applicants for concealed carry licenses demonstrate proper cause.

The Sponsor's Memo of the CCIA bill makes clear that the Legislature was set on complying with *Bruen* by transforming New York into a "shall issue" jurisdiction that secures the fundamental Second Amendment rights of all New Yorkers, while at the same time enacting measures to "prevent[] death and injury by firearms":

> The proposed legislation creates a new licensing procedure that satisfies the requirements set forth by the United States Supreme Court decision in [*Bruen*]. Notably, this replaces the "proper cause" requirements of New York's current conceal carry law, with a new set of requirements that protects individuals' Second Amendment rights as determined by the Supreme Court. Under this bill, applicants who successfully meet New York's conceal carry license applications requirements will receive their license.

*See* S51001 State Senate Sponsor Memo, SD Ex. 1 at 4. Although many of New York's lawmakers vehemently disagreed with *Bruen*, New York respected and complied with the opinion of the high court, revising its laws to stand side by side with the 43 "shall-issue" states whose laws were endorsed by the *Bruen* majority. *See id.* at 1 (discussing the purpose of the statute and explaining that "[t]he proposed legislation changes the concealed carry permitting process and adds specific eligibility requirements.").

For instance, New York clarified its longstanding requirement that concealed carry licensees have "good moral character." To that end, the CCIA defines the term to "mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Ch. 371, 2022 N.Y. Laws § 1 (codified at N.Y. Penal Law § 400.00(1)(b)).

This definition was patterned on a Connecticut licensing statute endorsed by the *Bruen* Court. *Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9 (referencing Conn. Gen. Stat. § 29-28(b)). And it is similar to the licensing requirements of other "shall-issue" jurisdictions approved of in *Bruen* that evaluate persons for dangerousness, including Pennsylvania, Virginia, Georgia, Colorado, Indiana, and Illinois. *See id.*; Pa. Cons. Stat. § 6109(d)(3) (sheriff must determine "whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety."); Va. Code. § 18.2-308.09(13) (judge may

reject licensing request if "the court finds, by a preponderance of the evidence" that the

applicant "is likely to use a weapon unlawfully or negligently to endanger others."); Colo.

Rev. Stat. § 18-12-203(2) (sheriff may reject application if he or she "has a reasonable belief

that documented previous behavior by the applicant makes it likely the applicant will present a

danger to self or others."); 430 Ill. Comp. Stat. Ann. 66/10(a)(4) (allowing permits only for an

applicant who "does not pose a danger to himself, herself, or others, or a threat to public safety

as determined by the Concealed Carry Licensing Review Board."); *see also* Ind. Code 35-47-

2-3(e-g) (Indiana State Police "shall issue" the license only "[i]f it appears to the

superintendent that the applicant . . . is of good character and reputation" and "is a proper

person to be licensed."); Ga. Code Ann. § 16-11-129(d)(4) (judge "shall issue such applicant a

license or renewal license to carry any weapon . . . unless the judge determines such applicant

has not met all the qualifications, is not of good moral character, or has failed to comply with

any of the requirements . . .").

    To determine whether an applicant has good moral character such that he or she would

not use a weapon in a dangerous manner, the CCIA requires the applicant to undergo a

background check, including an in-person interview, a criminal history check, and a review of

character references and public social media accounts. N.Y. Penal Law § 400.00(1)(n), (o).

Specifically, applicants must submit the "names and contact information of no less than four

character references who can attest to the applicant's good moral character and that such

applicant has not engaged in any acts, or made any statements that suggest they are likely to

engage in conduct that would result in harm to themselves or others." *Id.* § 400.00(1)(o)(ii).

Applicants must also provide "a list of former and current social media accounts . . . from the

past three years to confirm" that information. *Id.* § 400.00(1)(o)(iv). To be clear, there is no requirement that an applicant submit their social media passwords to the licensing officer or disclose social media postings that are not available to the public.

The CCIA also requires applicants to complete sixteen hours of in-person safety training course, including instruction on firearms safety, safe storage requirements, and conflict de-escalation as well as a two-hour live fire range training course. *Id.* § 400.00(19). Applicants must submit a certificate that they have completed these trainings. *Id.* § 400.00(1)(o)(iii).

## FACTUAL BACKGROUND

### A. Plaintiff's Allegations in This Lawsuit

Plaintiff avers that he applied to the NYPD for a concealed carry license application on April 14, 2022. Affidavit of Jonathan Corbett, dated August 22, 2022 (Corbett Aff.") ¶ 3, ECF No. 11-1. The NYPD allegedly informed him that an officer will not be assigned to review his application for about nine months. *Id.* ¶ 6.

Plaintiff does not claim that the Governor has any role in reviewing or deciding his license application and, in fact, concedes that "the NYPD is the appropriate—and only—agency empowered by law to accept such an application and grant such a license to him." Plaintiff's Motion for Preliminary Injunction With Incorporated Memorandum, dated August 22, 2022 ("Pl. Mem.") at 4, ECF No. 11. Rather, Plaintiff alleges that the Governor is the "chief executive of the laws of the state," and that she publicly criticized the *Bruen* decision and quickly convened an extraordinary session of the State Legislature to enact the CCIA. Compl. ¶¶ 8, 26-27, ECF No. 1.

Plaintiff brings a facial challenge to three CCIA provisions that he claims violate the

9

Second Amendment: (1) the character reference disclosure requirement; (2) the social media disclosure requirement; and (3) the requirement that he complete firearms training (the "Challenged Requirements"). He further claims that the social media requirement violates his right to free speech under the First Amendment. Pl. Mem. at 6-13. However, he does not challenge the "good moral character" standard under which an applicant's social media and character references are reviewed. Nor does he allege an as-applied challenge to any of the Challenged Requirements.

Plaintiff filed the Complaint on July 11, 2022, but did not move for a preliminary injunction for another six weeks and did not seek a temporary restraining order. The Court scheduled a hearing on Plaintiff's preliminary injunction motion for September 28, 2022. ECF No. 12.

**B.  The Denial of Plaintiff's Prior Application for a Concealed Carry License**

Plaintiff previously applied to the NYPD for a concealed carry license in December 2015. *See Corbett v. City of New York*, No. 18-cv-7022 (KPF), 2019 WL 2502056, at *1 (S.D.N.Y. June 17, 2019). He refused to answer three questions on the application: have you ever (1) "Been discharged from employment;" (2) "Used narcotics or tranquilizers;" and (3) "Been subpoenaed to, or testified at, a hearing or inquiry conducted by any executive, legislative or judicial body?" *Id.* at *2. In a "letter of necessity" requiring the applicant to set forth a detailed explanation why his or her employment necessitated carrying a concealed handgun, Plaintiff wrote that he "conducts business as a civil rights advocate" and "[i]n order to exercise his civil rights fully, he needs a carry license." *Id.* The NYPD denied Plaintiff's application for failure to complete the application and failure to demonstrate proper cause in the letter of necessity. *Id.* at *3.

10

Plaintiff then filed an Article 78 proceeding against the City of New York. He claimed that the NYPD irrationally denied his application and that the "proper cause" standard was unconstitutional. *Corbett v. City of New York*, No. 158276/16, 2017 WL 550191, at *1 (Sup. Ct. N.Y. Cty. Feb. 7, 2017). The court dismissed all claims for failure to state a cause of action, *id.* at *3, and the Appellate Division affirmed. *Corbett v. City of New York*, 160 A.D.3d 415 (1st Dep't 2018), *lv. denied*, 31 N.Y.3d 913 (2018).

Plaintiff then brought an action against the City of New York and an NYPD official in federal court claiming that the license application questions and the proper cause standard were unconstitutional. *Corbett*, 2019 WL 250256, at *1. The City defendants raised various defenses but did not claim that Plaintiff lacked standing or that they were improper parties. *Corbett v. City of New York*, No. 18-cv-07022 (S.D.N.Y.), ECF No. 14 (defendants' brief in support of their dismissal motion). The district court dismissed the complaint on *res judicata* grounds and for failure to state a claim, *Corbett*, 2019 WL 2502056, at *6, and the Second Circuit affirmed. *Corbett v. City of New York*, 816 F. App'x 551 (2d Cir. 2020).

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The burden is on Plaintiff to establish (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* at 20. The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *L&M Bus Corp. v. Bd. of Educ.*

11

*of City Sch. Dist. of City of N.Y.*, No. 18-cv-1902, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where an injunction is "mandatory" (*i.e.*, it alters the status quo rather than maintaining it). *People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015). Any injunction issued here would be mandatory because Plaintiff seeks to enjoin an existing law.

Moreover, in cases such as this one, where a plaintiff asks the Court to enjoin a duly enacted statute, requiring "a heightened showing is consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'" *Bill & Ted's Riviera, Inc. v. Cuomo*, 494 F. Supp. 3d 238, 244 (N.D.N.Y. 2020) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). Plaintiff must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. *Actavis*, 787 F.3d at 650. Plaintiff cannot meet this high bar.

## ARGUMENT

## I.     PLAINTIFF LACKS STANDING TO SUE

The standing doctrine "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original). To have standing for injunctive relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of

12

the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Oneida Indian Nation v. U.S. Dep't of Interior*, 336 F. Supp. 3d 37, 44 (N.D.N.Y. 2018) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 14 F.3d 129, 131 (2d Cir. 1998)).

Plaintiff has not met his burden to establish standing to sue here because his purported injury is not fairly traceable to the Governor who has no role in reviewing his license application. This is reinforced by the recent decision in *Antonyuk v. Bruen*, No. 22-cv-0734, (N.D.N.Y.) ("*Antonyuk*") where the court dismissed another challenge to the CCIA for lack of standing, in part because many of the requirements challenged by the *Antonyuk* plaintiffs were not fairly traceable to the defendant in that case, the Superintendent of the New York State Police (the "Superintendent").

### A. Plaintiff's Alleged Injuries Are Not Fairly Traceable to Governor Hochul

Under New York's firearms licensing laws, only a "licensing officer" in the city or county in which the applicant resides or has a place of business may issue a concealed carry license. N.Y. Penal Law § 400.00(1), (3). In New York City, the licensing officer is the Commissioner of the NYPD. *Id.* § 265.00(10).

To satisfy "the irreducible constitutional minimum of standing" a plaintiff must demonstrate that his injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). In *Libertarian Party*—a Second Circuit case directly on point—two plaintiffs had their pistol license applications denied by two judges

13

who were local licensing officers. 870 F.3d 106, 122 (2d Cir. 2020), *abrogated in part on other grounds by Bruen*, 142 S.Ct. 2111.[2] The plaintiffs brought claims against the judges, the Governor, the Attorney General, and the Superintendent of the State Police. *Id.* at 114. The Second Circuit affirmed dismissal of all claims against the Governor, the Attorney General, and the police superintendent because "the only defendants to whom [plaintiffs'] alleged injuries were fairly traceable were the judges who denied their respective applications. None of the other defendants were alleged to have had any role in the licensing process or in the consideration of the applications of [plaintiffs]." *Id.* at 122.

So too here. Plaintiff lacks standing to sue Governor Hochul because she has no role in deciding his application. The Licensing Division of the NYPD, a New York City agency, will review it and determine whether or not to issue him a license. The NYPD may be a proper party here, but under controlling authority, the Governor clearly is not.[3] Accordingly, this motion must be denied. *See Marino v. Twn. of Branford*, No. 17-cv-1828, 2018 WL 691715, at *2 (D. Conn. Feb. 2, 2018) (denying preliminary injunction motion because "plaintiff appears to have sued the wrong defendants" and "[a]s a result, the court cannot grant him the relief he seeks").

Notably, Plaintiff also lacks a concrete injury-in-fact because his application has not been denied—the NYPD is currently reviewing it. In *Libertarian Party*, the Second Circuit found that the only plaintiffs who alleged an injury-in fact were those that submitted licensing applications

---

[2] The *Bruen* decision abrogated the Second Circuit's decision in *Libertarian Party*, 970 F.3d 106, only to the extent *Libertarian Party* (1) upheld New York's "proper cause" requirement under the Second Amendment; and (2) applied means end scrutiny to plaintiffs' Second Amendment challenge. *Bruen*, 142 S.Ct. at 2127 & n.4. The Second Circuit's decision otherwise remains controlling precedent, including its rulings relating to the circumstances in which an applicant for a firearms license may, or may not, have standing to sue.

[3] Plaintiff should be aware of this given that he already brought two actions against the City of New York—not the State or the Governor—for denying his 2015 concealed carry license application.

and had those applications denied. 970 F.3d at 122.[4]

## B.  The Decision and Order in *Antonyuk v. Bruen*

In *Antonyuk*, plaintiffs—gun rights organizations and an individual—sued the Superintendent of State Police, bringing a broader challenge to the CCIA than Plaintiff does here. *See* Antonyuk Compl., ECF No. 1. Unlike Plaintiff Corbett, the *Antonyuk* plaintiffs challenged requirements that an applicant have good moral character, and that he or she participate in an in-person interview with the licensing officer. *Id.* The *Antonyuk* plaintiffs also challenged the CCIA's list of sensitive and restricted locations where individuals are generally barred from carrying weapons (the "Restricted Locations Prohibition"). *Id.* They moved for a preliminary injunction against all of these requirements. Antonyuk, ECF No. 9.

The court dismissed the action *sua sponte* for lack of standing and denied plaintiffs' motion for a preliminary injunction as moot. Antonyuk Decision and Order, ECF No. 48 at 2. The court found that only two of the various requirements plaintiffs challenged could be "fairly traced" to the Superintendent. First, the firearms safety training requirement could be traced to

---

[4] To be sure, there is a line of cases that permits plaintiffs in certain circumstances to bring a facial challenge to the constitutionality of a statute even if it has not yet been enforced against them. *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments*, 852 F.3d 178, 184 (2d Cir. 2017); *NYSRPA v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) *abrogated in part on other grounds, Bruen*, 142 S.Ct. 2111 (2022). But those cases do not apply here. First, to plead standing in such a "pre-enforcement review" case, plaintiff must plausibly allege that he "intends to engage in conduct proscribed by a statute and 'there exists a credible threat of prosecution thereunder'" that is "sufficiently imminent." *Adam v. Barr*, 792 F. App'x 20, 22 (2d Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 160 (2014)). There is no credible threat of prosecution here, however, because Plaintiff has not alleged that he will carry an unlicensed handgun if he does not obtain a license. Second, and relatedly, the pre-enforcement review cases apply only where plaintiffs already engaged in conduct that might subject them to prosecution—not where they must take an affirmative step to be subject to the statute. *See NYSRPA*, 804 F.3d at 251, 263 (considering "pre-enforcement" standing where dealers and owners of assault rifles challenged assault weapons ban). Because individuals must apply for a license to come under the ambit of the CCIA, they are not in danger of the requirements being enforced against them unless they take this affirmative step. *See Libertarian Party*, 970 F.3d 106 (analyzing applicants' challenge to firearms licensing provisions without considering pre-enforcement review). Accordingly, the "pre-enforcement review" principle does not apply and for this reason too, Plaintiff lacks standing to bring a facial challenge to the CCIA.

him because the Superintendent approves the curriculum for the courses and promulgates related rules and regulations. *Id.* at 27-28. Second, the Restricted Locations Prohibition could be traced to him to the extent it is enforced by the State Police because it is the duty of the Superintendent and the State Police "to prevent and detect crime and apprehend criminals," including those who carry weapons into restricted areas. *Id.* at 28-29 (quoting N.Y. Exec. Law § 223(1)).

The court nonetheless found the individual plaintiff lacked standing as to those claims because he had not shown an injury-in-fact. He did not allege injury from the training requirement because he would not need to take those courses (though the court was not entirely clear on this point). *Id.* at 28 n.8. And plaintiff had not shown a credible threat of prosecution from a potential violation of the Restricted Locations Prohibition because he testified, among other things, that he always carries his handgun in compliance with the law. *Id.* at 28.

Plaintiff here does not name the Superintendent as a defendant. The firearms safety training requirement is clearly not traceable to the Governor because, unlike the Superintendent, she does not approve the curriculum for the courses or promulgate related regulations. *See* N.Y. Penal Law § 400.00(19). And Plaintiff here does not challenge the Restricted Locations Prohibition, which is not fairly traceable to the Governor in any event because she does not have a direct role in preventing crime or apprehending criminals.[5]

---

[5] In *dicta*, the court analyzed whether the Governor might be a proper defendant in a case that challenges the Restricted Locations Prohibition. Antonyuk Decision and Order at 30-31. The court cited four district court decisions in firearms cases dismissing the Governor as a defendant but questioned their applicability to the Restricted Locations Prohibition because "the Governor could simply replace a Superintendent who refuses to enforce the CCIA." *Id.* at 31. But even if the Governor's choice of Superintendent did somehow cause a plaintiff an injury-in-fact, it would not be redressable. For separation of powers reasons, a court cannot order the Governor to fire one Superintendent and replace him with another one (let alone order the State Senate to confirm the appointment). *See Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005) (plaintiff's request to enjoin President from appointing clergy member for inauguration "raises serious separation of powers concerns"); *see also Tedards v. Ducey*, 398 F. Supp. 3d 529, 546 (D. Ariz. 2019) ("Even if there was harm here, there is not redressability, as the

In short, *Antonyuk* only serves to reinforce that Plaintiff's alleged "injury-in-fact" cannot be fairly traced to the Governor who has no role in enforcing the CCIA requirements Plaintiff challenges.[6]

## II.  THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS

The Eleventh Amendment prohibits lawsuits in federal court against a state without the state's waiver of immunity or valid abrogation by Congress. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54-55 (1996). This immunity includes suits like this one "against state officials in their official capacities." *Li v. Lorenzo*, 712 F. App'x 21, 22 (2d Cir. 2017) (citing *Davis v. N.Y.*, 316 F.3d 93, 101-02 (2d Cir. 2002)). "New York has not waived its immunity for damages claims brought under 42 U.S.C. § 1983." *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977)). Nor did Congress abrogate State immunity in enacting Section 1983. *Id.* (citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990).

To be sure, *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to Eleventh Amendment immunity that permits suits for prospective injunctive relief against state officials

---

Court cannot order the Governor to appoint a replacement [U.S. Senator] that is suitable to plaintiffs."). And even if it could, this theory of standing would have no relevance in a challenge to the licensing laws (such as the one in this case), which is foreclosed by the Second Circuit's controlling decision in *Libertarian Party*, affirming dismissal of claims against a previous Governor because he did not have "any role in the licensing process or in the consideration of the applications."  970 F.3d at 122.

[6] Despite the *Antonyuk* court's finding that it "lacks subject matter jurisdiction," Antonyuk Decision and Order at 52, the opinion nonetheless contains an advisory section following the court's dismissal of the action for lack of standing that discusses plaintiffs' likelihood of success on the merits. The court expressly stated that this section was "judicial dictum . . . not essential to the Court's decision." Antonyuk Decision and Order at 53. The court opined that plaintiffs were unlikely to succeed on their challenge to the firearms training requirement and that the character reference requirement was not unconstitutionally burdensome. *Id.* at 63-64, 66. However, the court criticized other aspects of the CCIA. Although the merits section of the *Antonyuk* Decision and Order has no precedential weight "[b]ecause no court has the power to address the merits of a case in the absence of subject matter jurisdiction," *Pan v. Whitaker*, 351 F. Supp. 3d 246, 249 (E.D.N.Y. 2019), Defendant nonetheless discusses the court's comments in this brief where applicable.

for ongoing violations of federal law. However, that narrow exception only applies if "the state officer against whom a suit is brought" has "'some connection with the enforcement of the act' that is in continued violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005) (quoting *Ex parte Young*, 28 S. Ct. at 157); *see also Mendez v. Heller*, 530 F.2d 457, 460 (2d Cir. 1976) (citing *Ex Parte Young* and finding Attorney General was not a proper defendant in action challenging State statute because he "has no connection with [its] enforcement.").

Applying this principle, district courts in this Circuit have repeatedly held that the Governor and other high-level State officials are immune from lawsuits challenging firearm restrictions. *See Sibley v. Watches*, 501 F. Supp. 3d 210, 234 (W.D.N.Y. 2020) (Governor immune from lawsuit challenging statute banning possession of unlicensed weapons because he did not have a specific role in enforcing it); *Aron v. Becker*, 48 F. Supp. 3d 347, 368-69 (N.D.N.Y. 2014) (finding Governor immune "[i]nasmuch as Plaintiff has failed to 'make any allegations whatsoever with respect to the Governor's role in the enforcement of any [firearm licensing] statutes at issue, or with any acts taken pursuant thereto"); *Osterweil v. Bartlett*, 819 F. Supp. 2d 72, 75 (N.D.N.Y. 2011) (Governor was improper party), *vacated on other grounds by* 738 F.3d 520 (2d Cir. 2013).

Here, the Governor is sued only in her official capacity in an action brought under Section 1983. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (Section 1983 provides "a method for vindicating federal rights elsewhere conferred"). As discussed above, the Governor does not enforce the Challenged Requirements. That is the role of local licensing officers who decide license applications. Because Governor Hochul has no specific

enforcement role, the *Ex parte Young* exception does not apply, and she is immune from suit.[7]

Notably, courts have consistently held that an official's "general duty to enforce or execute the law is insufficient to overcome Eleventh Amendment immunity." *Sibley*, 501 F. Supp. 3d at 234; *Aron*, 48 F. Supp. 3d at 369; *N.Y.S. Motor Truck Ass'n v. Pataki*, No. 03-cv-2386, 2004 WL 2937803, at *12 (S.D.N.Y. Dec. 17, 2004); *Wang v. Pataki*, 164 F. Supp. 2d 406, 410 (S.D.N.Y. 2001); *Gras v. Stevens*, 415 F. Supp. 1148, 1152 (S.D.N.Y. 1976); *see also Citizens Union of the City of N.Y. v. Attorney General of N.Y.*, No. 16-cv-9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (collecting cases) ("it has been held that 'a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute.'"). Thus, the Governor's role as chief executive of the State (*see* Compl. ¶ 8) does not render her a proper defendant or abrogate her Eleventh Amendment sovereign immunity.[8]

## III. PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff brings a facial challenge to the CCIA but does not appear to assert an as-applied challenge. *See* Compl. ¶ 6. Even if he did, it would plainly fail because the NYPD is not finished

---

[7] The court in *Antonyuk* noted in *dicta* that it "agree[d] with Plaintiffs' argument [that] the Eleventh Amendment does not bar suit because it does not bar a plaintiff from suing a state official acting in his official capacity for prospective injunctive relief from violations of federal law." Antonyuk Decision and Order at 50 n.21. However, the court did not consider that the *Ex parte Young* exception applies only if the official has some connection to the enforcement of the statute. In any event, the Governor was not a defendant in that action and the court did not find she has any role in enforcing the requirements Plaintiff challenges herein.

[8] To the extent Plaintiff seeks to hold the Governor liable for her role in pressing for the CCIA in response to the *Bruen* decision, convening an extraordinary session of the Legislature to pass it, and signing it into her law (rather than her supposed enforcement role), she is protected by legislative immunity. *See Bogan v. Scott Harris*, 523 U.S. 44, 55 (1998) (absolute legislative immunity extends to executive branch official "when they perform legislative functions" such as introducing and enacting legislation); *State Emps. Bargaining Coal. v. Rowland*, 494 F.3d 71, 90 (2d Cir. 2007) (legislative immunity protects officials against official capacity claims to the extent such claims do not relate to statutory enforcement).

reviewing his license application.

"Facial challenges are generally disfavored" by courts because they "'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). To prevail on such a challenge, Plaintiff must show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Given this standard, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Id.*

There are certainly foreseeable constitutional applications of the Challenged Requirements, including, for example, preventing someone intent on killing others from acquiring a weapon either because he refuses to complete the required safety training courses or has announced his plans to friends and family or publicly on social media.

Plaintiff plainly fails to meet this high bar, and accordingly, he has not pled a viable facial challenge to each of the Challenged Requirements under the Second Amendment, or to the social media disclosure requirement under the First Amendment.

### A.    The Challenged Requirements Are Constitutional Under the *Bruen* Test

Contrary to Plaintiff's claims, the review of applicants' character references and public social media postings is not standardless; it is reviewed under the well-defined, Supreme Court-approved, good moral conduct standard. These portions of an applicant's background check are also well-grounded in historically analogous statutes that sought to prohibit dangerous people from acquiring weapons. As for the training requirements, they are contemplated in the text of

20

the Second Amendment itself, correspond to laws requiring the mustering and training of members of the militia, and are likewise constitutional.

> 1.  *Background Checks to Determine Dangerousness Are Endorsed by Bruen and Follow Longstanding Anglo-American Traditions.*

The social media and character reference disclosure requirements are designed to ensure that licensing officials are provided with information about an applicant's associates, behavior, and demeanor critical to determining his or her fitness to possess a firearm. They are part of a background check that also includes an in-person interview and submission of information about the applicant's criminal history and living situation. N.Y. Penal Law § 400.00(1)(n), (o).

Laws like this one preventing dangerous people from acquiring or possessing weapons are in keeping with the Constitution and the historical record. As Justice Barrett—who was in the majority in *Bruen*—wrote in dissent in a Seventh Circuit opinion: "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J. dissenting).

The *Bruen* Court endorsed the laws of 43 "shall issue" jurisdictions that "often require applicants to undergo a background check" to ensure the applicants are law-abiding and responsible. 142 S.Ct. at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."). The laws and policies of many states, including several "shall-issue" jurisdictions, specifically require applicants to submit statements from third parties attesting to their character. *See, e.g.*, 11 Del. Code § 1441(2) (requiring certificate signed by five respectable citizens attesting that the applicant is "of full age, sobriety and good moral

21

character, that the applicant bears a good reputation for peace and good order in the community

in which the applicant resides"); Or. Rev. Stat Ann. § 166.291(4) (requiring two "character

references"); Application for a Pennsylvania License to Carry Firearms, SD Ex. 2 at 2, *available

at* https://bit.ly/3zJtWaC (requiring "two references who are 21 years of age or older and are of

no relation to you"); *see also* Md. Code Regs. 29.03.02.03(B)(5) ("Information received from

personal references and other persons interviewed" will "be a part of the investigation of every

applicant."); N.J. Admin. Code § 13:54-2.4 ("The application . . . shall be endorsed by three

reputable persons who have known the applicant for at least three years . . . and who shall also

certify thereon that the applicant is a person of good moral character and behavior.").[9]

---

[9] The *Antonyuk* court did not consider the character reference requirement to be an unconstitutional burden on plaintiffs. Antonyuk Decision and Order at 63-64. However, within its "judicial dictum," the court did take issue with the definition of good moral character in the CCIA, which means "having the essential character, temperament and judgment necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." N.Y. Penal Law § 400.00(1)(b). First, the court criticized this definition for not including the words "other than in self defense," finding that any time one uses a weapon, they must "endanger" others. Antonyuk Decision and Order at 56-58. But the court overlooked that in ordinary usage, it is the person who must use a weapon in self-defense who is "endangered," *i.e.* "in danger of being harmed." Cambridge Dictionary, Cambridge University Press (2022). The aggressor is causing the danger, and it would be unusual to describe that person as "endangered." *See* Sutherland Statutory Construction § 47:28 ("[W]ords are interpreted to take their ordinary, contemporary, common meaning in the absence of persuasive reasons to the contrary"). Unilaterally interpreting the statute to encompass lawful self-defense also runs contrary to the well-established canon of constitutional avoidance, under which federal courts interpreting statutes "are bound to avoid deciding the constitutional question if the ambiguous statutory text to be interpreted . . . fairly admits of a less problematic construction." *Doyle v. U.S. Dep't of Homeland Sec.*, 959 F.3d 72, 77 (2d Cir. 2020); *see, e.g., Hettler v. Entergy Enterprises, Inc.*, 15 F. Supp. 3d 447, 453 (S.D.N.Y. 2014) (rejecting proposed interpretation of statute that "would raise serious constitutional questions" because "courts must construe the statute to avoid raising such questions.").

Moreover, there are several "shall issue" state laws that have requirements similar to the CCIA's "good moral character" standard and deny licenses to applicants who "present a danger to self or others" (Colo. Rev. Stat. § 18-12-203(2)) or approve applications only if an applicant "does not pose a danger to himself, herself, or others." 430 Ill. Comp. Stat. Ann. § 66/10(a)(4). If the court's *dicta* were correct, these "shall-issue" laws would also be unconstitutional because the person using the weapon in self-defense poses a danger to the aggressor. But the Supreme Court expressly approved of the laws in these jurisdictions. *Bruen*, 142 S.Ct. at 2123 & n.1, and said that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of those laws. *Id.* at 2138 n.9. Second, and relatedly, the court in *Antonyuk* opined that CCIA granted licensing officials too much discretion in determining good moral character though it acknowledged that this "presents a closer call." Antonyuk Decision and Order at 10, 62. However, a Connecticut statute the Supreme Court endorsed also denied licenses to those lacking character "to be entrusted with a weapon." To be sure—and as the court in *Antonyuk* pointed out—the Connecticut law does not include the phrase "endanger oneself or others," (*id.* at 58), but that language is permissible for the

Background checks, including assessments of a potential gun owner's reputation and propensity to violence, find much historical support in Anglo-American tradition. Throughout our history, officials assessed the dangerousness of individuals and groups and refused to arm— or actively disarmed—those who were seen to pose a credible threat.[10] *See, e.g.* SD Ex. 3 (1662 Act by King Charles II of England authorizing royal officials to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge dangerous to the Peace of the Kingdom.") (Militia Act of 1662, 13 & 14 Car. 2, c. 3 § 13 (1662)); SD Ex. 4 (An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians (1763), *in* 6 <u>The Statutes at Large of Pennsylvania From 1682 to 1801</u>, at 319-20 (WM Stanley Ray 1899);[11] SD Ex. 5 (Massachusetts Bay Colony's 1637 order disarming the followers of a dissident preacher, and prohibiting them from acquiring additional arms, because there was "just cause of suspition that they . . . may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment.") (1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853)); SD Ex. 6 ("An Act for Disarming Papists, and Reputed Papisits, Refusing to Take the Oaths to the Government" because "it is dangerous at this time to permit Papists to be armed" (1756), in 7 William W.

---

reasons just stated. In any event, this dictum is not binding here. More to the point, Plaintiff here does not even challenge the good moral character requirement.

[10] To the extent that any of the reports or scholarly articles cited in this memorandum may be considered hearsay under Federal Rule of Evidence 801, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010).

[11] Although these laws reflect the broad pre- and post-Founding understanding that gun possession could be restricted in cases where a person was dangerous or unfit, some are based on racial or religious animus that is repugnant to a modern understanding of the Constitution. *Cf. Pena-Rodriguez v. Colorado*, 137 S.Ct. 588, 867 (2017) ("It must become the heritage of our Nation to rise above the racial classifications that are so inconsistent with our commitment to the equal dignity of all persons."). A clear-eyed look at American history and doctrine will necessarily reveal episodes that are shameful but nonetheless relevant, as the *Bruen* opinion teaches us. *See* 142 S.Ct. at 2150-51. Of course, if a modern instance were to arise where gun licensing requirements were applied in a discriminatory manner, it could, should, and would be struck down as unconstitutional.

Hening, <u>The Statutes at Large, Being a</u> <u>Collection of all the Laws of Virginia</u> 35-36

(Richmond: Franklin Press, 1809)); SD Ex. 7 (1776 Massachusetts Act ""disarming such

person as are notoriously disaffected to the cause of America.") (Act of March 14, 1776, in

1775-1776 Mass. Acts & Laws 31); SD Ex. 8 ("An Act to Oblige the Free Male Inhabitants of

this State Above a Certain Age to Give Assurances of Allegiance to the Same" or the inhabitant

would be disarmed (1777)") (9 William W. Hening, <u>The Statutes at Large, Being a</u>

<u>Collection of all the Laws of Virginia</u> 281, 281-82 (1821); Patrick J. Charles, <u>Armed in</u>

<u>America: A History of Gun Rights from Colonial Militias to Concealed Carry</u> 156 & n.219

(2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th

century and early 20th century, requiring a permit to carry firearms in cities across the United

States subject to the discretionary determination of an official).

Each of these measures—and many others—restricted those who were seen as

dangerous from obtaining or possessing weapons. *See Kanter*, 919 F.3d at 456 (Barrett, J.,

dissenting) (noting that "threatened violence and the risk of public injury" is "the same

concern that animated English and early American restrictions on arms possession). New

York's disclosure requirements, wherein an official assesses the danger an applicant poses to

himself or others, are consistent with these historic restrictions on the right to bear arms.

Plaintiff's unsupported assertion that these requirements have no historical analogue from the

1700s and 1800s is simply incorrect. *See* Pl. Mem. at 7.[12] The cited authorities demonstrate

---

[12] Plaintiff also erroneously claims (1) that the CCIA "sets no objective standard" for whether an applicant's social media is acceptable; (2) that licensing officers are given "complete discretion" in reviewing social media accounts; and (3) that the "references requirement works similarly." Pl. Mem. at 8. But Plaintiff misses that an applicant's character references and social media are reviewed for evidence of good moral character, which is a longstanding requirement of New York law that was further clarified in the CCIA. Ch. 371, 2022 N.Y. Laws § 1 (codified at N.Y.

that governments from the Colonial, Founding, and Reconstruction eras considered

individuals' apparent propensity to violence in allowing or disallowing them weapons. *See*

*Bruen*, 142 S.Ct. at 2132-33 (historical analysis should consider "why" current regulation may

burden Second Amendment rights and how that rationale compares to potential historical

analogues).

To be sure, not every historical measure included the submission of character

references, and naturally, none required a disclosure of public social media postings. But that

is not the test.[13] "[A]nalogical reasoning requires only that the government identify a well-

established and representative historical *analogue*, not a historical *twin*. So even if a modern-

day regulation is not a dead ringer for historical precursors, it still may be analogous enough to

pass constitutional muster." *Bruen* 142 S.Ct. at 2133 (emphasis in original). Indeed, even

where historical analogues are limited, a regulation may be upheld based on "general historical

tradition." *United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *3 (W.D. Okla.

August 18, 2022) (post-*Bruen* decision upholding federal statute barring firearm possession by

misdemeanants convicted of domestic violence despite "paucity of evidence" supporting

exclusions of domestic violence offenders from Second Amendment protections).

New York's licensing requirements are not only analogous to their historical precursors,

---

Penal Law § 400.00(1)(b)). The Second Circuit found the significantly broader pre-CCIA version of this
requirement constitutional at "the first step of the [Heller] analysis," (that was upheld in Bruen), because it "does not
burden the ability of law-abiding, responsible citizens to use arms." *Libertarian Party*, 970 F.3d at 127. The Court
also found the implications of the good moral character standard to be "easily understandable," and that examples of
its proper application "are not beyond an ordinary person's comprehension; nor are they rare." *Id.* at 126. Obvious
examples include "addiction to drugs," "repeatedly reckless conduct while intoxicated," and "threats to harm
others." *Id.* Because this is an "easily understandable" standard, consistent with controlling precedent, Plaintiff's
characterization of the Challenged Requirements is unfounded.

[13] Similarly, Eighteenth Century laws did not provide for "fingerprinting" or "a mental health records check,"
among other provisions approved of by justices in the *Bruen* majority. 142 S.Ct. at 2162 (Kavanaugh, J. concurring).

they are actually *more* solicitous of an applicant's right to bear arms. *See Bruen*, 142 S.Ct. at 2132-33 (in historical analysis, court should consider "how" current and historical regulations burdened Second Amendment rights). Unlike its precursors that relied on officials' suspicions about the suitability of a person or group, the CCIA gives control to the applicant to select four references who can attest to his character as a responsible, law-abiding citizen.  N.Y. Penal Law § 400.00(1)(o)(ii). And New York does not bar an individual from obtaining a license merely because they belong to a group seen as subversive. A licensing officer instead makes an individualized assessment of the applicant's propensity for dangerousness based on their character references, public social media, criminal history, and other information.

2. *The Social Media Requirement Is Critical to Determining Whether an Applicant Will Use a Weapon only in a Manner That Does Not Endanger Oneself or Others*

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions," including those that "limited the intent for which one could carry arms."  *Bruen*, 142 S.Ct. at 2156. Justice Barrett herself stated in dissent that American history "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Kanter*, 919 F.3d at 464 (Barrett, J. dissenting). In a detailed analysis, she explained that "the historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety" even if they have not been convicted of a felony. *Id.* at 454. The concern "that animated English and early American restrictions on arms possession" was not with every person who committed a crime, but with "threatened violence and the risk of public injury." *Id.* at 456. A legislature may thus restrict

26

weapons for persons "shown to be untrustworthy with [them]," and such "exclusions need not mirror limits that were on the books in 1791." *Id.* at 464-65.

The social media disclosure requirement falls comfortably within these constitutional restrictions on dangerous individuals arming themselves. The rule is critical because a public social media posting—perhaps even more than the other required disclosures—may reveal specific threats or indicators of violence that demonstrate an intent to use a weapon aggressively. This is not a speculative or hypothetical statement: again and again, people who commit mass shootings have had a long trail of disturbing content on their social media accounts, often posted well before they legally purchase the guns used to commit their atrocities. For instance, an investigative committee of the Texas House of Representatives found that in the year before his attack, the Uvalde shooter "began to demonstrate interest in gore and violent sex, watching and sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like." Texas House of Representatives Investigative Committee on the Robb Elementary Shooting, Interim Report 2022. SD Ex. 9 at 32. He later "developed a fascination with school shootings, of which he made no secret. His comments about them coupled with his wild threats of violence and rape earned him the nickname 'Yubo's school shooter'" on the Yubo social media platform. *Id.* at 34. Some of his interactions on social media were "with total strangers." *Id.* at 36. All of this activity took place before the shooter bought his gun, legally, when he turned 18. *See id.*

The Parkland, Florida shooter posted photos of himself with masks and guns, in body armor, showing off his arsenal of weaponry, and "posted pictures and videos of deceased animals, killing squirrels and shooting at alligators in the eyes" on Snapchat. SD Ex. 10.

27

School classmates said he brought knives, bullets, and dead animals to school. (Florida Department of Law Enforcement, Unreported Information Showing [Shooter]'s Troubling Behavior, available at https://bit.ly/3zEdPuZ). On YouTube, the Parkland shooter announced "Im going to be a professional school shooter" just five months before he carried out the mass shooting. This and all of the other comments he made on YouTube were publicly available. Dakine Andone, et al., Parkland gunman spent weeks making violent social media posts, cnn.com, available at https://www.cnn.com/2022/07/28/us/nikolas-cruz-social-media-online-searches/index.html. And the shooter who killed ten people in Buffalo this May posted on social media networks Discord and 4Chan about where and when he would launch his attack. See Travis Caldwell, et al., Online posts reveal suspected gunman spent months planning racist attack at a Buffalo supermarket, cnn.com, available at https://cnn.it/3djje36.

Plaintiff conclusorily claims that social media disclosure will have "no benefit to public safety." Pl. Mem. at 2. But there is an obvious benefit to discouraging a would-be mass shooter from applying for a firearms license because they would have to disclose a violent or threatening social media account. And while Plaintiff flatly states that every mass shooter will "simply lie[] on their application," id. at 1, he provides no evidence to support that claim, and ignores that other information disclosed due to the Challenged Requirements may well lead a licensing officer to incriminating material an applicant tried to hide.

Contrary to Plaintiff's claims, preventing a mass shooter from killing innocent people is a natural consequence of the social media disclosure requirement. Because that is surely a constitutional application of the law, Plaintiff's facial challenge to it must fail. Salerno, 481

U.S. at 745.[14]

### 3.   *The Training Requirements Are Consistent with the Second Amendment*

Plaintiff argues—incredibly, and without citation to any historical or legal authority—that training requirements have never "been a part of, or analogous to, any scheme in use in this country in the 1700s or 1800s." Pl. Mem. at 7. This is simply wrong, both as a matter of history and as a matter of law: mandatory training has been a fundamental aspect of the right to bear arms since the Founding era and before, and is written into the text of the constitution. *See Heller*, 554 U.S. at 597 ("the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training") (citing Va. Declaration of Rights § 13 (1776) ("a well-regulated militia, composed of the body of the people, trained to arms")); *see also* U.S. Const. Art. I § 8 cl. 12 ("The Congress shall have . . . the authority of training the Militia according to the discipline prescribed by Congress.").

At the time of the Founding, and stretching well into the Nineteenth Century, virtually every male citizen was required to serve in the militia, and to train extensively. *See Heller*, 554 U.S. at 596. New York, for instance, required "[t]hat every able-bodied male person, being a citizen of this state, . . and who are of the age of sixteen, and under the age of forty-five years, shall . . . be enrolled . . ." An Act to Regulate the Militia (1786), *in* Thomas Greenleaf, <u>Laws of the State of New York, Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive</u> 230 (1792); *see also* SD Ex. 11 Federal Militia Act, 1 Stat 271, 271 ("That each and every free able-bodied white male citizen of

---

[14] The court in *Antonyuk* did not apply this facial challenge standard to the social media disclosure requirement. *See* Antonyuk Decision and Order at 64-65. In its brief examination of this requirement under the Second Amendment, contained in the advisory portion of its opinion, the court criticized only its reliance on the good moral character standard. But this critique is flawed for the reasons set forth above. *See supra* at 22 n.9.

the respective states, resident therein, who is or shall be of the age of eighteen years, and under

the age of forty-five years . . . shall severally and respectively be enrolled in the militia"). Each

member of the militia was subject to extensive and ongoing training requirements and federal

law required that "it shall be the duty of the commanding officer at every muster . . . to cause the

militia to be exercised and trained agreeably to the [] rules of discipline." SD Ex. 11 Federal

Militia Act, 1 Stat at 273.

For a New Yorker, that could mean up to six times per year: the 1780 Act for regulating

the militia of the State of New York provided for two regimental parades and four company

musters each year. SD Ex. 12 (1779 N.Y. Laws 239); *see also United States v. Miller*, 307 U.S.

174, 181 (1939) (noting that Virginia's militia statute required that "there shall be a private

muster of every company once in two months"). Each day's exercises involved a significant

commitment of time: New Jersey, for instance, passed a law stating "[t]hat the militia on the days

of exercise," could be drilled for up to "six hours," though the law also provided that after three

consecutive hours of drill, the militiamen must be allowed "a proper time to refresh themselves."

SD Ex. 13 (1806 N.J. Laws 536, 565). The same law established that there would be three

meetings each year for the purpose of exercising (once by companies, once by battalions, and

once by regiments), plus an additional 2-4 days of military exercises on the regimental level.[15]

*Id.* at 539-40. In contrast, New York's new law requires only sixteen hours of training (and two

additional hours of training) when applying for a new license or during the first renewal of a

_____

[15] The penalties for failure to take part in these exercises were severe. An ordinary citizen "who shall neglect to appear when called out" would "for every such offence forfeit the sum of eight pounds." SD Ex. 12 (1779 N.Y. Laws 240). This sum of money was tremendous at a time when the average citizen's income was approximately 14 pounds per year. *Cf.* Peter H. Lindert and Jeffrey G. Williamson, <u>American Incomes Before and After the Revolution</u>, 73 J. of Econ. Hist. No. 3, 725, 742 & table 3 (Sept. 2013).

license that occurs after September 1, 2022—a far cry from the arduous and mandatory training requirements of the Eighteenth and Nineteenth Centuries.[16]

Rather than consider the deep and well-established tradition of training requirements in American history, Plaintiff's moving papers focus instead on allegations about the cost of training, based not on any specific fees or figures, but rather on "estimates" from "[t]he complaint." Pl. Mem. at 9. Plaintiff's Complaint makes clear that these figures conflate multiple different categories (several of which have nothing to do with training), and that they are instead based on Plaintiff's own guesses. *See* Compl. ¶¶ 42-44 (adding up the NYPD's license application fee, the cost of fingerprinting, "[a]ssuming $500 for the [training] course fee" and "$20 each way for each commute.").[17] As an initial matter, the Second Circuit has already upheld New York City's licensing fee in *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013), finding that it did not unconstitutionally burden the Second Amendment and that it was fully consistent with the Supreme Court's fee jurisprudence. And as to the charges for training courses—which would be chosen by private instructors, without any fee set or collected by the Governor—Plaintiff's allegations are contradictory: he asserts that New York's requirements "will be the most onerous in the country," Pl. Mem. at 10, but admits that his guess of "$400-600 in course fees" is "based on training courses required in other states." Compl. ¶ 43.

In any event, requiring individuals to bear the reasonable costs of their firearms training

---

[16] The time commitment in New York's training requirements is consistent with those in other states across the nation. *See, e.g.,* Alaska Admin. Code § 30.070(a)(1)(A) (curriculum must "include[] at least 12 hours of training in the use of handguns . . . including a test of competence with a handgun"); Cal. Penal Code § 26165 (a)(3), (c) ("up to a maximum of 24 hours" and "shall include live-fire shooting exercises on a firing range"); 430 Ill. Comp. Stat. 66/75 ("at least 16 hours, which includes range qualification time"); N.M. Stat. Ann. § 29-19-7 ("not less than fifteen hours in length").

[17] This section of Plaintiff's memorandum of law implicitly acknowledges that Governor Hochul is not a proper defendant, admitting that his licensing application would be evaluated at "NYPD Headquarters." Pl. Mem. at 9.

is entirely "consistent with this Nation's historical tradition of firearms regulation." *Bruen*, 142 S.Ct. at 2126. New York's April 5, 1786 "Act to regulate the militia," for instance, required "[t]hat every citizen . . . shall, within three months [of being enrolled in the militia] provide himself, *at his own expence*, with a good musket or firelock, a sufficient bayonet and belt, a pouch, with a box therein to contain not less than twenty-four cartridges suited to the bore of his musket or firelock, each cartridge containing a proper quantity of powder and ball, two spare flints, a blanket and knapsack; and shall appear so armed, accoutered and provided, when called out to exercise or duty, as herein after directed." Thomas Greenleaf, <u>Laws of the State of New-York</u>, *supra*, at 228 (1792), (emphasis added); *see also* SD Ex. 11 (Militia Act, 1 Stat at 271); *Dukakis v. Dep't of Defense*, 686 F. Supp. 30, 33 (D. Mass. 1988) ("[V]irtually every able-bodied man between 18 and 45 was enrolled in the militia and required to arm himself at his own expense."). Militia service also required significant travel multiple times per year, at a citizen's own expense, and at a time when travel could be difficult and dangerous. *Cf.* Greenleaf, <u>Laws of the State of New-York</u>, *supra*, at 234 (exempting certain citizens of Washington and Montgomery counties due to their "great extent," but only such persons "as shall live at a greater distance than thirty miles" from the mustering ground).

Similarly, the militia statutes provided that citizens were required to take time out of their schedules for training in arms, without separate compensation for doing so. As discussed above, state militia statutes could require that citizens participate in military exercises six times a year or more. This necessarily involved a significant commitment of time: militia "membership was service to the state that always disrupted one's chosen round of activities." David C. Williams, <u>Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment</u>, 101 Yale L.J.

580 (Dec. 1991). However, the militia statutes did not require that states compensate citizens for the time spent in mandatory training, instead reserving wages for times of "actual service." Greenleaf, <u>Laws of the State of New-York</u>, *supra*, at 232; *accord* SD Ex. 14 (1781 N.Y. Laws 445) (pay received "from the time of his marching out into said service until he be properly discharged therefrom"); Henning, <u>Collection of All the Laws of Virginia</u>, *supra*, at 18-19 ("And whenever any militia shall be in actual service, they shall be allowed pay and rations, as follows . . ."). Plaintiff has adduced no facts to support his assertions about the costs of training (let alone facts connecting those costs to the Governor), and even if he had, the Founding-era tradition of firearms training laws demonstrates that it is constitutional to require an applicant to bear the reasonable costs of training.

### B. Plaintiff's First Amendment Challenge Fails Because the Social Media Disclosure Provision Passes Intermediate Scrutiny

Plaintiff's First Amendment argument is based entirely on a contention that the social media disclosure provision burdens anonymous speech, *see* Pl. Mem. at 11, but as a threshold matter it does not appear that he actually has standing to bring that claim in his own right. Plaintiff nowhere alleges that he himself is engaged in anonymous speech that will be burdened by the requirement. *See* Corbett Aff. (making no such allegation). Instead, both the Complaint ¶¶ 36-37, and Plaintiff's moving brief, speak only in exaggerated hypotheticals, such as a "gay person struggling to come out to their family," a person "who sells nude pictures of themselves online," a person "who uses social media to document police misconduct," or a person with HIV "disclosing infection." Plaintiff is none of those people. In short, Plaintiff has not asserted an as-applied challenge because he does not claim to engage in the anonymous speech that is purportedly inhibited by the disclosure requirement. And to the extent Plaintiff brings a facial

challenge, he faces an extremely high burden as discussed above—one he plainly cannot meet.

Because the social media disclosure requirement is content-neutral, intermediate scrutiny governs Plaintiff's First Amendment claim.[18] *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 160 (2d Cir. 2013); *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Under intermediate scrutiny, the challenged measure must be "narrowly tailored to serve a significant governmental interest," but this standard does not "imply that a regulation must be 'the least restrictive or least intrusive means of achieving the stated governmental interest.'" *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006) (cleaned up) (quoting *Ward*, 491 U.S. at 798).

The social media disclosure requirement comfortably passes the intermediate scrutiny test, particularly in the context of a facial challenge, which requires a plaintiff to show that a challenged measure "cannot constitutionally be applied to anyone." *United States v. Jimenez*, No. 15 Cr. 496, 2016 WL 8711451, at *1 (S.D.N.Y. June 3, 2016) (Schofield, J.). As to the first prong, years of Second Circuit precedent establishes that "it is beyond cavil that states have substantial, indeed compelling, governmental interests in public safety and crime prevention" that undergird the gun licensing laws. *Libertarian Party*, 970 F.3d at 128 (quoting *NYSRPA*, 804

---

[18] In the portion of its opinion issued without subject-matter jurisdiction, the *Antonyuk* court agreed with the plaintiffs' arguments concerning the social media disclosure requirement not being content neutral because "it applies only to 'pro-gun' persons." Antonyuk Decision and Order at 11, 65 (citing plaintiffs' arguments). But the *Antonyuk* plaintiffs provided no evidence that the requirement would be enforced only against "pro gun" applicants or that it in any way discriminates against such applicants. They merely speculated that licensing officers must be anti-gun because few licensing applications are allegedly approved, and then assumed based on this speculation that applicants will self-censor on social media. *See* Antonyuk Pls' Reply Mem., ECF No. 40, at 28-29. This conjecture is not a valid basis to declare a law unconstitutional. Rather than look to the *Antonyuk* plaintiffs' suppositions, the Court should rely on the standards actually set forth in the CCIA, *i.e.*, that public social media activity will be reviewed only to ensure an applicant will not use a weapon in a dangerous manner.

F.3d at 261). Accordingly, the outcome turns on the narrow tailoring prong, which "is satisfied so long as the content-neutral regulation promotes a substantial governmental interest that *would be achieved less effectively absent the regulation*." *Mastrovincenzo* 435 F.3d at 98 (cleaned up, emphasis in the original) (quoting *Ward*, 491 U.S. at 798).

The social media disclosure provision is closely circumscribed, and narrowly tailored to determining whether the applicant presents a significant danger of violence. It is triggered by voluntary behavior—a decision to apply for a gun license—and the disclosure is limited to "a list of former and current social media accounts of the applicant from the past three years." N.Y. Penal Law § 400.00(1)(o)(iv). The CCIA does not require the applicant to provide the password to such accounts, nor does it require a licensing officer to review non-public information. Moreover, contrary to Plaintiff's claims, the social media requirement is not standardless; it is actually tied to a very specific dangerousness standard, with review geared toward the narrow question of "the applicant's good moral character [as defined and narrowed by Section 1(b) of the CCIA] and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id.* § 400.00(1)(o)(ii).

The Second Circuit has previously pointed to obvious "examples of several sound bases . . . for denying an applicant's request to possess a firearm, such as his threats to harm others, or his addiction to drugs, or his repeatedly reckless conduct with a weapon while intoxicated." *Libertarian Party*, 970 F.3d at 126. It is entirely likely that such examples could be reflected in an applicant's public social media postings. Moreover, recent history has shown repeated examples of mass shooters whose path towards violence was reflected in their social media, and

who later acquired the firearms used to commit their atrocities via the legal market. *See supra* pt. II(A)(2); *see also e.g.*, Gabrielle Fonrouge, <u>Twisted diary of alleged Buffalo shooter . . . reveals his online radicalization</u>, N.Y. Post, May 17, 2022, available at <u>https://bit.ly/3CCqWjw</u>. If licensing authorities have a list of an applicant's social media accounts and review the public postings for indicia of dangerousness, applicants who would use a weapon in a dangerous manner may be kept from accessing the legitimate market in firearms, furthering the substantial public interest in safety from gun violence. Because the social media disclosure provision can be constitutionally applied, Plaintiff's facial First Amendment challenge must fail.

## IV.   PLAINTIFF HAS NOT MADE A STRONG SHOWING OF IMMINENT AND IRREPARABLE HARM

"In the Second Circuit . . . [the] presumption of irreparable harm arising from a constitutional deprivation is not automatic." *Joglo Realties, Inc. v. Seggos*, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016). Instead, the Circuit has found it "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997).

Here, Plaintiff fails to make a strong showing of "irreparable harm that is imminent" required when seeking a mandatory injunction. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999); *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 472 F. Supp. 3d 88, 92 (S.D.N.Y. 2020). The NYPD has not denied Plaintiff's application, nor does Plaintiff claim that he does not satisfy the CCIA requirements such that it will be denied. And even if the NYPD does deny Plaintiff's application, it may be for reasons having nothing to do

36

with the Challenged Requirements. His prior application was denied because he refused to answer basic questions about his background. Accordingly, Plaintiff has not established any irreparable injury emanating from the CCIA's requirements.

Moreover, even assuming the NYPD ultimately denies Plaintiff's application because of the Challenged Requirements, there is no evidence that the decision will be made "imminently." In fact, Plaintiff avers just the opposite—that an NYPD licensing officer will not be assigned to review his application until at least January 2023. Corbett Aff. ¶ 6. Plaintiff therefore fails to show irreparable harm. *See Rodriguez*, 175 F.3d at 235 (reversing district court's preliminary injunction order because irreparable injury could not have been "imminent" given district court's finding that no harm would occur for eight months).

Plaintiff's claims of imminent irreparable harm are further undercut by his delays in bringing this motion. The CCIA was enacted July 1, 2012, but Plaintiff did not move to enjoin the Challenged Requirements for more than seven weeks, and for six weeks after he brought the Complaint. Plaintiff's "[l]ack of diligence, standing alone" "preclude[s] the granting of preliminary injunctive relief." *Brooklyn BrandsLieberman*, No. 18-cv-7245, 2018 WL 10246003, at *1 (E.D.N.Y. Dec. 23, 2018).

## V. THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT PUBLIC SAFETY

In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Here, Plaintiff has no plausible claim of injury at this juncture: his application may be granted, or it may be denied for reasons unrelated to the CCIA. Conversely, "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people,

it suffers a form of irreparable injury,' particularly where there would be 'an ongoing and concrete harm to . . . public safety interests.'" *Our Wicked Lady LLC v. Cuomo*, No. 21-cv-165, 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Without the character reference and social media disclosure requirements, guns may end up in the hands of persons who should not have them; without the training requirements, guns may end up in the hands of persons who are not able to wield them responsibly. These significant public safety concerns, particularly when weighed against the nonexistent harm to Plaintiff, weigh strongly against issuing an injunction.

## **CONCLUSION**

For all of the reasons stated above, Plaintiff's motion for a preliminary injunction should be denied, and the Court should grant any further relief to Governor Hochul that it deems just and proper.

Dated: September 5, 2022

LETITIA JAMES
Attorney General
State of New York


By: _____/S/_____
Todd A. Spiegelman
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8661
todd.spiegelman@ag.ny.gov

*Attorney for Governor Hochul*

38