**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jonathan Corbett, *Plaintiff*<br><br>v.<br><br>Kathleen Hochul *et al.*, *Defendants* | Case No. 1:22-CV-5867(LGS)(SDA)<br><br>**RENEWED MOTION FOR PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM** |

## I.    <u>Introduction</u>

There is no doubt that gun crime is a serious problem that must be addressed in this state and elsewhere in America.  There is also no longer any doubt that the Second Amendment to the U.S. Constitution provides an individual right to bear arms, unconnected to membership in a "militia," that is enforceable against the states, applies outside of the home, and may not be denied to the ordinary, law-abiding citizen.  *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022)[1].  In creating and enforcing the law, these two realities both require substantial consideration by our legislature and executive.  There exist common-sense policy options to keep guns out of the hands of people who will use them for crime without infringing on the rights of the ordinary citizen to bear arms, and Plaintiff, like most Americans, prays that our legislators implement these common-sense options.

However, requiring license applicants to present all of their online musings for government review is simply not one of them.  Law-abiding citizens will be forced to relinquish their right to anonymous speech and Internet privacy, while the next mass shooter simply lies on the application and omits any incriminating social media accounts.  Diligent investigators, of course, may find

---

[1] All references to "*Bruen*" are to this case unless otherwise distinguished.

incriminating social media anyway, but they could do the same just as well without this law.  In other words, the law only serves to punish law-abiding citizens who will be honest on their applications, with no benefit to public safety.

This appears to actually be the point of the law: anything to keep fewer guns in the hands of the ordinary citizen is the explicit objective of Gov. Hochul's office and the state legislators of her party.  But this is exactly what the U.S. Supreme Court just declared that states – and New York in particular – may not do.  Because there is no *legitimate* government interest being served here, let alone tailoring towards that interest, the social media requirement is unconstitutional under the <u>First</u> Amendment.  It is also unconstitutional under the Second Amendment, where, post-*Bruen*, the question is whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen* at *8.  A requirement to allow the government to sift through one's communications before granting a license has never been a part of that tradition.

The other two facets of the law challenged in this case – the references requirement and the training requirement – are similarly designed to disenfranchise, and will actually effect a disenfranchisement of, the ordinary citizen, and they, too, have no roots in American tradition and thus run afoul of the Second Amendment.

"[T]he New York State Legislature has generated an unconstitutional statute in the CCIA." *Antonyuk v. Bruen*, 1:22-CV-734, at *56 (N.D.N.Y., August 31st, 2022).  Plaintiff respectfully asks the Court for interim relief.  The U.S. Supreme Court has set the status quo with *Bruen*.  New York has modified it by passing the challenged law, which substantially took effect earlier this month (after the complaint in this action was filed but before this renewed motion).  The Court should preliminarily enjoin this modification unless and until New York can demonstrate that their

new law meets the exacting requirements set by the Supreme Court – a hurdle which, especially given the Governor's candid admissions, is unlikely to ever be met.

II.    <u>**Standard of Review**</u>

"A party seeking to stay government action taken in the public interest pursuant to a statutory or regulatory scheme must establish (1) a likelihood of success on the merits, and (2) irreparable harm in the absence of an injunction." *Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 245 (2nd Cir. 2014) (*cleaned up*).  In general, violations of fundamental constitutional rights causing more than mere economic injury automatically constitute irreparable harm.  <u>*See*</u>, *e.g.*, *We The Patriots U.S., Inc. v. Hochul*, 17 F.4th 266, 294 (2nd Cir. 2021) ("a presumption of irreparable injury flows from a violation of constitutional rights," *internal citation omitted*); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2nd Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," *internal quotation marks omitted)*.  Put simply, infringements on liberty cannot merely be repaid, and are thus irreparable.  In such an instance, "whether plaintiffs have satisfied the requirements for a preliminary injunction turns on whether they have shown a likelihood of success on the merits of their claim…" *Latino Officers Ass'n, N.Y. v. City of N.Y.*, 196 F.3d 458, 462 (2d Cir. 1999); <u>*but see Agudath Isr. of Am. v. Cuomo*</u>, 983 F.3d 620 (2nd Cir. 2020) (also considering public interest).

Whether Corbett is likely to prevail on his challenged that New York's gun laws are constitutional requires the Court to interpret *Bruen* for the first time. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is

consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen* at \*8 (*cleaned up*).

Although a modern "analog" of a historical regulation may survive scrutiny, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Bruen* at \*20 (*cleaned up*); <u>see also</u> *Antonyuk* at \*19, \*20 (distilling *NYSPRA v. Bruen*: "courts must consider the following: (1) 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense'; and (2) 'whether that [regulatory] burden is comparably justified.'"). The burden of proof is on the government. *Bruen* at \*10 ("the government must affirmatively prove that its firearms regulation is part of the historical tradition").

Finally, whether Corbett is likely to prevail on his First Amendment claim regarding the social media rule depends on whether the rule is adequately tailored to the governmental interest. A law that "risks chilling online speech, anonymous and otherwise, it is subject to heightened scrutiny under the First Amendment." *Cornelio v. State*, 32 F.4th 160, 170 (2nd Cir. 2022). At a minimum, the Court must apply intermediate scrutiny[2]. "The burden of demonstrating that the disclosure requirement satisfies intermediate scrutiny falls on the government. To carry that burden, the government must show that the challenged law (1) advances important governmental

---

[2] Given the serious chilling implications for this disclosure requirement and high potential for discrimination (given especially that the law provides no guidance to licensing officials as to how they should evaluate disclosed social media accounts), strict scrutiny would be more appropriate, and to be clear, Plaintiff submits that strict scrutiny is required. Under this standard, there applies "a strong presumption against constitutionality" as the burden on the government is to demonstrate that the law is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 177 (2015). However, the law cannot pass even intermediate scrutiny, and if the Court agrees, it need not resolve the tricky question of which standard applies.

interests unrelated to the suppression of free speech and (2) does not burden substantially more speech than necessary to further those interests. To establish that the law advances important governmental interests, the government must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 171 (*cleaned up*). "The government must [also] demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

### III.    <u>Statement of Facts</u>

On or about April 14th, 2022, Plaintiff Jonathan Corbett applied for a gun license with the New York City Police Department ("NYPD"). Ex. A., Corbett Aff., ¶ 3. Corbett maintains a residence and a business located in Brooklyn, and nowhere else within the State of New York, and thus the NYPD is the appropriate – and only – agency empowered by law to accept such an application and grant such a license to him[3]. *Id.*, ¶ 2.

---

[3] This is actually Corbett's second application for a gun license with the NYPD. Corbett applied for the same in 2016 and was rejected on the grounds of failing to demonstrate "proper cause," as well as declining to answer several invasive and minimally-relevant questions on the application. Corbett challenged the constitutionality of the proper cause requirement (and the invasive questions) in state court, which upheld the proper cause requirement based on the Second Circuit's decision in *Kachalsky* and was affirmed by the First Department. *Corbett v. City of N.Y.*, 73 N.Y.S.3d 568 (N.Y. App. Div. 2018) (*citing Kachalsky v. County of Westchester*, 701 F.3d 81 (2nd Cir. 2012)). The New York Court of Appeals declined to hear the case. *Corbett v. City of N.Y.*, 2018 N.Y. Slip Op. 76160 (N.Y. 2018). Corbett then asked this Court to review, but this Court held that the procedural posture of the state proceedings had a claim preclusive effect, and the Second Circuit affirmed. *Corbett v. City of New York*, No. 19-2152 (2nd Cir., June 4th, 2020). This lawsuit presents neither the proper cause nor the invasive question challenge, as the proper cause requirement was struck by *Bruen* and Corbett answered the invasive questions. Corbett Aff., ¶ 9.

Corbett was asked to appear in-person at NYPD headquarters to complete fingerprinting, and did so on May 6th, 2022.  *Id*., ¶ 4.  During this time, Corbett was advised that his application would likely take about 9 months from that date to be assigned to an investigator.  *Id*., ¶ 6.  Corbett has received no update regarding his application status since, and, upon belief, the application has not yet been assigned to an investigator.  *Id*., ¶ 7.

After Corbett's fingerprinting, but, upon belief, before the assignment of his application to an investigator, several changes were made to the legal background.  First, the U.S. Supreme Court overturned New York's "proper cause" requirement.  *Bruen* (July 23rd, 2022).  In response, Governor publicly deemed the *Bruen* holding as "outrageous[4]," "reckless[5]," "reprehensible[6]," "horrific[7]," and "appalling[8]" on her official Twitter account and made similar statements to the media.  She then called an extraordinary session of the state legislature for the purpose of passing new laws restricting gun rights[9].   The result of this session was a bill numbered S51001, which was passed and signed into law on July 1st, 2022, and contains the provisions that are the basis for this challenge.

Plaintiff engages in anonymous speech that he does not want to have (or intend) to disclose to the government.  Corbett Aff., ¶ 10.  He similarly does not intend to obtain 4 references or complete the training requirements.  Corbett Aff., ¶¶ 11, 12.

---

[4] https://twitter.com/GovKathyHochul/status/1539983179641229313
[5] https://twitter.com/GovKathyHochul/status/1540802617902866433
[6] https://twitter.com/GovKathyHochul/status/1540161345915600896
[7] https://twitter.com/GovKathyHochul/status/1541874003085824000
[8] https://twitter.com/GovKathyHochul/status/1540832953688809473
[9]    https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-begin-june-30

IV.   **Argument**

A.   *None of the Three Challenged Rules Are Consistent with This Nation's Historical Tradition of Firearm Regulation*

In *Bruen*, the Supreme Court eschewed any use of means-end scrutiny for Second Amendment claims.  Instead, once it is established that a government regulation is covered by "the Second Amendment's plain text," then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen* at *8.  A reviewing court should pay particular attention to the historical tradition at the time the right was adopted. *Id*. at *25, 26.  In the case of gun rights, this means we are speaking of "[t]he Second Amendment … adopted in 1791 [and] the Fourteenth in 1868."  *Id*; *see also* *29 (declining to decide if context at ratification of Second or at ratification Fourteenth Amendment is controlling).  And, the *Bruen* court left no doubt that state licensing requirements for those seeking to keep and bear arms are covered by the plain text of the Second Amendment.  *Id*. at *23.

The Court can likely take judicial notice that neither the founding fathers nor President Johnson and the 40th United States Congress intended that the gun rights they were writing into the Constitution were contingent upon a review of anyone's social media, which came into existence in the 1990s and became popularized in the decade that followed.  The inquiry does not end there, however, because the existence of a historical "analog" can be sufficient to demonstrate consistence with historical tradition.  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id*. at *21 (*emphasis in original*).

Here, however, the inquiry *does* end before much more ink need be spilled: no matter whether you analogize social media to letters, newspaper articles, speeches in the public square,

or whatever other traditional media or social platforms one may conjure, a review of one's speech has *never* been a prerequisite to obtaining permission to keep and bear arms, nor had training or references requirements been a part of, or analogous to, any scheme in use in this country in the 1700s or 1800s.  *Bruen* explores the most common historical firearm restrictions and starts by dividing them into "restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry."  *Id*. at *29.  None of these categories bear any relation to the social media restriction, the references requirement, or the training requirement.  And, should the government wish to try an analogize a past restriction to those challenged here, the burden is on them to do so, not on Plaintiff to disprove a negative.  *Bruen* at *10; *see also Antonyuk* at 54 ("the Government must rebut the presumption of protection against New York State's firearm regulation by demonstrating that the challenged portions of the statute are consistent with this Nation's historical tradition of firearm regulation").

> B.  *The Social Media and References Requirement Require Impermissible Exercise of Judgment by Licensing Officials*

The *Bruen* court also generally discusses licensing schemes, noting that those that contain "narrow, objective, and definite standards" to ensure that only law-abiding, responsible citizens may be armed are likely constitutional, while those "requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion" are not.  *Bruen* at *30, fn. 8.  The court does not make clear how this blends with the historical analysis discussed *supra*, but the reading most generous to the state is that a licensing requirement that is: 1) tailored only to excluding those who are not law-abiding or responsible, and 2) identifies narrow, objective, and definite standards to be used, is permissible notwithstanding any historical context.

Even adopting the view, *arguendo*, that narrowly tailored licensing rules meeting these criteria bypass the historical review, the social media requirement appears to be the exact opposite of what the Supreme Court had in mind.  The law sets no standard whatsoever – let alone an objective standard – for determining if an applicant's social media is acceptable or disqualifying (nor what to make of an applicant who does not use social media).  Licensing officials within the state have already expressed consternation at the same[10].  The licensing official is thus given complete discretion to appraise the facts, exercise judgment, and form an opinion as to whether the applicant will possess arms responsibly.  It is also unclear as to what a licensing official should do if a social media account raises questions: may they require further disclosures, or issue an administrative subpoena to the social media providers, or demand a psychiatric evaluation?  In contrast to a requirement that one not be a felon, or that one not be addicted to drugs, or even that one complete (reasonable) training programs, which can be accomplished objectively, it is clear that this rule goes the wrong way, and is far closer to a discretionary "proper cause" review (and thereby susceptible to the same abuse that lead New York to license the rich and connected and scorn the commoners for over 100 years) than a ministerial checking-of-the-boxes.

The references requirement works similarly.  At the outset, the obvious should be stated: the provision of references is not merely such that licensing officials check off a box that says "supplied references," but rather for the purpose of allowing the licensing officer *to evaluate and speak to the references* and, once again, appraise facts, exercise judgment, and form an opinion[11].

---

[10] *See*, *e.g.*, New York State Sheriffs' Association, "Statement Concerning New York's New Firearm Licensing Laws," https://nysheriffs.org/statement-concerning-new-yorks-new-firearms-licensing-laws/ (July 6th, 2022) (lamenting "burdensome, costly, and unworkable nature of many of the new laws' provisions").

[11] Even if a licensing officer has discretion to choose not to speak to any of the authors of reference letters, they still must evaluate the face of the reference letter and use judgment as to whether it is sufficiently effusive as to the character of the applicant to support the granting of a license.

They also require the person writing the reference letter to do the same, essentially as an agent for the licensing officer.  This impermissibly rests a person's constitutional rights upon the whims of others: we subject no other constitutional right to the approval of third parties and we should not start with this one.  Further, in a city such as New York where large segments of the population disfavor gun rights, it says little about someone if they cannot find four individuals who wish to help them get a gun[12], and it further burdens an applicant to polarize his or her social circle by seeking such references.

### C.  *The Training Requirement Denies Ordinary Citizens Their Right to Carry*

"[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications[13] or exorbitant fees deny ordinary citizens their right to public carry."  *Bruen* at *30, fn. 8.

Subsection 19 to § 400.00 requires an applicant to complete 18 hours of training: 16 hours of "in-person live curriculum" and 2 hours of "live-fire range training."  The complaint estimates that this section increases the total time required for Plaintiff to obtain a permit to 31-38 hours and

---

[12] It also says little about one who can muster up 4 references: surely every extremist group could organize to vouch for its own members, and the text of the law does not even appear to prohibit references-for-hire.  Is having 4 people sitting in an office who agree to meet converse with an applicant for 15 minutes, "get to know them," and then write a letter in exchange for a few hundred dollars the next big business idea for New York entrepreneurs?  The undersigned hopes not.

[13] The nine months of processing time quoted to Corbett by the licensing officer he met during his fingerprinting is, at best, on the outer edge of constitutionally permissible.  Although this lawsuit does not currently challenge the processing time, the government should be on notice that any further delays would result in a motion for leave to amend the complaint or other appropriate remedy.

the total cost to $1,128.50.  Complaint, ¶ 44.  This does not count the cost of taking off of work to complete multiple business-hours in-person trips to NYPD headquarters.

Also as discussed in the complaint, "[m]inimum wage in this state is now $15 and a minimum wage earner in the Bronx working 40 hours per week, filing as single with no dependents but themselves, will take home about 76% of their check after taxes.  Using those numbers, this minimum wage worker must work for 99 hours just to pay for a license.  In other words, for this worker to take the time to apply for, finish the training for, and work at their job to pay the application fee for, a gun license in New York, it will take them up to 135 hours of their life, if they are even allowed by their employer to take the time off from work necessary to complete the process."  Complaint, ¶ 45 – 47.

This is exactly the type of "exorbitant fees [that] deny ordinary citizens their right to carry" of which the *Bruen* court forewarned.  New York's training requirement, when effective[14], will be the most onerous in the country[15], and no court of which Plaintiff is aware has approved a 4-figure licensing cost.  The time and cost above will be prohibitive to many, if not most, ordinary citizens. And its purpose is not merely to ensure "responsible" gun owners, as required by *Bruen*, and as evidenced by the topics of the coursework contemplated by the law. *See* § 400.00(1)(19) (topics include "situational awareness," "suicide prevention," *etc*[16].).   As such, it is unconstitutional[17].

---

[14] No training courses have yet been certified, and Plaintiff was able to find no expected availability of the same before mid-2023.

[15] Plaintiff would be happy to catalog a list of requirements for each state should this be disputed.

[16] It is not alleged that these topics are not important.  They are simply unrelated to ensuring that a gun owner is *responsible*, as required by *Bruen*.

[17] Even with the inclusion of these superfluous topics, it is unclear how 16 hours of time will be filled.  Of the 11 topics enumerated in the law, three of them can take no more than 10 minutes ("safe storage" and "sensitive places" rules are simple and can be explained and understood by lay

D.  *The Social Media Requirement Violates the First Amendment*

The social media requirement independently violates the First Amendment of the U.S. Constitution, as applied to the states through the Fourteenth Amendment, because "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *Watchtower Bible Tract Society v. Village, Stratton*, 536 U.S. 150 (2002) (*reaffirming* McIntyre); *see also Antonyuk* at **63 – 66 (finding First, Second and Fifth Amendment problems with the social media requirement).. Statutes dispensing with anonymous speech may also violate the free association clause of the First Amendment.  *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association…").

The breadth of the disclosure required by the social media requirement cannot be overstated: other than direct, one-on-one communications like e-mail, virtually any environment in which one may speak on the Internet can be considered social media.  There is no exception for political speech, religious speech, or any variety of advocacy.  If one uses anonymous speech on the Internet to support (or oppose) abortion rights (perhaps also disclosing one's personal experiences with the same), to declare that Israel (or Palestine) has a greater claim to the West

---

people in minutes, and one cannot imagine "best practices when encountering law enforcement" to consist of anything more than disclosing the weapon, keeping hands visible, and following orders).  Two more seem to overlap each other almost entirely ("conflict de-escalation" and "conflict management").  Another is a complete subset ("use of deadly force" a subset of "state and federal gun laws").  We are therefore left with 15½ hours from the following list: general firearm safety, state/federal gun laws, conflicts, suicide prevention, and marksmanship, along with the 30 minutes or less required for safe storage, sensitive places, and law enforcement best practices.  This is gratuitous.  The legislature's selection of 16 + 2 hours was arbitrary at best, intentionally disenfranchising at worst.

Bank (perhaps disclosing "disloyalty" to the family religion), to advocate for those with HIV (perhaps disclosing infection), or to support (or oppose) reform of the agency charged with issuing gun licenses, these people all must now "out" themselves to the licensing authority.  One who sells nude pictures of themselves on "Only Fans" would be required to show their nude body to the licensing authority, as would one who sought medical advice for their genital warts on Reddit, as would the new mother seeking lactation advice in an Instagram group.

In Plaintiff's case, the licensing authority is the New York City Police Department.  The only limiting clause in the law is that the social media account has been used in the last 3 years, which provides little help given that a single post in the last 3 years would require the disclosure of an account that may have been sharing content for a decade a more.  A requirement to share the most intimate details of one's life, intended to stay anonymous, in order to exercise another constitutional right, is nothing short of outrageous.  Plaintiff indeed uses the Internet to speak anonymously.  Corbett Aff., ¶ 10.

The effect of the social media restriction is to burden many kinds of speech, including core political and other highly-protected speech, and thus "exacting scrutiny" is likely appropriate. *McIntyre* at 334, 335.  Even applying intermediate means-end scrutiny, however, the social media requirement cannot pass First Amendment muster.  First, given the statements of Defendant Hochul and her appointees and legislative counterparts, the "governmental objective" cannot be assumed to be in good faith.  The public statements by the Governor can be fairly construed to demonstrate intent to override the decision of the U.S. Supreme Court and continue to disenfranchise "ordinary" New Yorkers.  Gov. Hochul is entitled to her opinion that the high court's decision was as "outrageous," "reckless," "reprehensible," "horrific," and "appalling," but she cannot then go and force the legislature into a room until they accomplish the same goal that

the court just prohibited.  The words of the Lt. Governor – Hochul's second-in-command – are even more clear when he said that the law was intended to "not … let the Supreme Court reverse years of sensible gun regulations.[18]"  In other words, the government itself has announced that the intent of the state law is to reverse federal law as laid down by the U.S. Supreme Court.  This Court would be well-reasoned if it held that intermediate scrutiny is not passed because there is no intent to address a *legitimate* governmental objective: when officials admit that their intent is to overrule the Supreme Court, the courts should take them at their word.

Notwithstanding and turning a blind eye to the explicit statements from the Governor and her office by pretending that the governmental objective is merely to reduce injuries and deaths caused by gun violence, this objective would without question be "important."  But the requirement then must also be tailored to that objective, and there is no evidence of any tailoring whatsoever.  There is no attempt to filter out irrelevant and highly sensitive material, such as the Only Fans, medical research, or other deeply personal content described *supra*.  There is no way to apply for a variance to the rule (for example, a psychiatric evaluation in lieu of disclosure).  There is no standard set for how to use and evaluate the information obtained from applicants.  There is no guidance as to what should be done if the social media review leaves the official with questions.  As such, there is no attempt at tailoring by means of excluding unnecessary burdens or providing for fair dispositions.  Given that no one intent on using their gun for evil would disclose a social media account containing evidence of the same, there is also little proximity between the

---

[18] Office of Gov. Kathy Hochul, "Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision," https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions (July 1st, 2022)

objective and the proposed solution.  The burden here far outweighs any benefit, which, other than disenfranchisement, is none.

### E.  *The Public Interest Favors Preliminary Injunction*

The public can have no interest in the continued enforcement of a law that violates their constitutional rights.  Plaintiff, like many in New York, has been waiting for years to exercise his Second Amendment rights and has been rejected by both the licensing officials and courts on bases that are now clearly erroneous in a post-*Bruen* world.  It is time for those rights to be vindicated.

The government will surely argue that, in light of the epidemic of gun violence, the Court should err on the side of caution.  However, Plaintiff is not asking that guns be handed out at Duane Reade.  "In its eight-day haste to pass a legislative response to the Supreme Court's decision in NYSPRA (which reads less like such a measured response than a wish list of exercise-inhibiting restrictions glued together by a severability clause in case some of the more fanciful restrictions were struck down)," the government replaced the status quo with a crazy quilt.  *Antonyuk* at \*56. The injunction requested is a stay of three <u>new</u> requirements *that have never existed in any state*. The requirements had not yet taken effect as of the time of the filing of this lawsuit, meaning licenses were being handed out right now without their application, and due to nine-month processing times[19], any possible injury to the public is far away and can be addressed by a motion for modification if and when the government fears that an injury is happening imminently and can

---

[19] This processing time was quoted to Plaintiff before *Bruen* was announced.  Post-*Bruen*, surely applications are at their zenith and processing time of "only" nine months is now a day dream.

convince the Court of the same.  In other words, the injunction requested maintains the status quo rather than creates a new potential risk to the public.

V.     <u>**Conclusion**</u>

It has been over 100 years since New Yorkers could fully exercise their rights to keep and bear arms.  The core issues having already been decided by the U.S. Supreme Court, and in the face of laws that are so clearly beyond the standards set by that court, we should delay not a day more.

The Court should **grant** this motion and a preliminary injunction substantially similar to the following should issue: "The enforcement of N.Y. Penal Law § 400.00(1)(o)(iv) (requiring disclosure of social media accounts), N.Y. Penal Law § 400.00(1)(o)(ii) (requiring four references), and N.Y. Penal Law § 400.00(19) (requiring pre-licensure or pre-renewal training) is hereby enjoined, and Defendants Kathleen Hochul, Letitia James, Eric Adams, Keechant Sewell, Hugh Bogle, and Kevin Bruen are hereby ordered, and ordered to direct the employees, officers, and agents of the State of New York, to cease enforcement of these provisions and to continue processing applications for gun licenses as if these sections were not present, until further order of the Court."

Dated:  New York, NY                                              Respectfully submitted,

       September 27nd, 2022

                                              */s/Jonathan Corbett*
                                        Jonathan Corbett, Esq.
                                        Plaintiff (attorney proceeding *pro se*)
                                        CA Bar #325608
                                        5551 Hollywood Blvd., Suite 1248
                                        Los Angeles, CA 90028
                                        E-mail: jon@corbettrights.com
                                        Phone: (310) 684-3870
                                        FAX:   (310) 675-7080