UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jonathan Corbett,

*Plaintiff*

v.

Kathleen Hochul, *in her official capacity as chief executive of the State of New York,* Letitia James, *in her official capacity as Attorney General of the State of New York,* Eric Adams, *in his official capacity as Mayor of the City of New York,* Keechant Sewell, *in her official capacity as Police Commissioner of the New York Police Department,* Inspector Hugh Bogle, *in his official capacity as Commanding Officer of the New York Police Department, Licensing Division, - and-* Kevin Bruen, *in his official capacity as Superintendent of the New York State Police*

*Defendants*

No. 22-cv-5867 (LGS)(SDA)

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005
*Attorney for State Defendants*

TODD A. SPIEGELMAN
Assistant Attorney General
*of Counsel*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL BACKGROUND ......................................................................................................... 3

    A.    NEW YORK STATE RIFLE & PISTOL ASSOCIATION v. BRUEN ................................ 3

    B.    THE CCIA ........................................................................................................ 4

    C.    THE DECISIONS IN ANTONYUK v. BRUEN AND ANTONYUK v. HOCHUL ........................ 6

FACTUAL BACKGROUND ..................................................................................................... 7

    A.    Plaintiff's Claims in this Lawsuit .................................................................... 7

    B.    The Denial of Plaintiff's Prior Application for a Concealed Carry License ........... 8

STANDARD OF REVIEW ....................................................................................................... 9

ARGUMENT ......................................................................................................................... 10

    I.    PLAINTIFF LACKS STANDING TO SUE ................................................................. 10

        A.    Plaintiff's Alleged Injuries Are Not Fairly Traceable to the State Defendants ........ 10

        B.    Plaintiff Has Not Suffered a Concrete "Injury-in-Fact" ............................. 12

    II.    THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS AGAINST   THE STATE DEFENDANTS ............................................................................... 14

    III.    PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS .................................................................................................... 15

        A.    The Character Reference Requirement is Constitutional ............................... 16

            1.    The Requirement Is Part of a Background Check Used to Determine Dangerousness That Is Endorsed by Bruen ............................. 16

            2.    Refusing Weapons to Individuals Found to be Dangerous Follows  Longstanding Anglo-American Traditions ............................. 18

        B.    The Social Media Requirement is Constitutional ......................................... 22

            1.    The Requirement is Constitutional Under the Second Amendment ................ 22

            2.    The Requirement Is Constitutional under the First Amendment ................ 25

       C.     The Training Requirements Are Constitutional .........................................................27

IV.    PLAINTIFF HAS NOT MADE A STRONG SHOWING OF IMMINENT AND IRREPARABLE HARM...........................................................................................................29

V.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT PUBLIC SAFETY ...........................................................................29

CONCLUSION.......................................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995) ................................................................................................................9

*Antonyuk v. Bruen*,
22-cv-0734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022)....................................................6, 11-12

*Antonyuk v. Hochul*,
No-22-cv-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ......................................................*passim*

*Aron v. Becker*,
48 F. Supp. 3d 347 (N.D.N.Y. 2014) ..............................................................................................15

*Bach v. Pataki*,
408 F.3d 75 (2d Cir. 2005), *overruled on other grounds by, McDonald v. Chicago*, 561
U.S. 742 (2010) ...............................................................................................................................13

*Bogan v. Scott Harris*,
523 U.S. 44 (1998) ..........................................................................................................................15

*Citizens Union of the City of New York v. Attorney General of New York*,
16-CV-9592,2017 WL 2984167 (S.D.N.Y. June 23, 2017) ............................................................15

*Corbett v. City of New York*,
18-CV-7022, 2019 WL 2502056 (S.D.N.Y. June 17, 2019) ..........................................................8-9

*Corbett v. City of New York*,
No. 158273/2016, 2017 WL 550191 (Sup. Ct. N.Y. Cty. Feb. 7, 2017), *aff'd*, 160
A.D.3d 415 (1st Dep't 2018), *lv. denied*, 31 N.Y.3d 913 (2018)......................................................9

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022)........................................................................................................26-27

*Dickerson v. Napolitano*,
604 F.3d 732 (2d Cir. 2010) ...........................................................................................................15

*District of Columbia v. Heller*,
554 U.S. 570 (2008)..................................................................................................................2, 27-28

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014)...........................................................................................................25

*Dukakis v. Dep't of Defense,*
    686 F. Supp. 30 (D. Mass. 1988) ............................................................................ 29

*Dwyer v. Farrell,*
    193 Conn. 7 (1984) ................................................................................................ 4

*Ex parte Young,*
    209 U.S. 123 (1908) ............................................................................................. 14

*In re Dairy Mart Convenience Stores,*
    411 F.3d 367 (2d Cir. 2005) ................................................................................ 14

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ............................................................................................. 13

*Jackson-Bey v. Hanslmaier,*
    115 F.3d 1091 (2d Cir. 1997) .............................................................................. 13

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) (Barrett, J. dissenting) ......................................... 19

*Li v. Lorenzo,*
    712 F. App'x 21 (2d Cir. 2017) ........................................................................... 14

*Libertarian Party of Erie Cnty. v. Cuomo,*
    970 F.3d 106 (2d Cir. 2020) ....................................................................... passim

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................. 10

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................................... 30

*Mastrovincenzo v. City of New York*
    435 F.3d 78 (2d Cir. 2006) .................................................................................. 26

*Mullins v. City of New York,*
    626 F.3d 47 (2d Cir. 2010) .................................................................................. 19

*New York State Rifle & Pistol Association v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................................... *passim*

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................... 9

*Osterweil v. Bartlett,*
   819 F. Supp. 2d 72 (N.D.N.Y. 2011), *vacated on other grounds by,* 738 F.3d 520 (2d
   Cir. 2013) ................................................................................................................................15

*Pan v. Whitaker,*
   351 F. Supp. 3d 246 (E.D.N.Y. 2019) ....................................................................................6

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom.*, Heller, 554 U.S. 570 ................................12

*People ex. rel. Schneiderman v. Actavis PLLC,*
   787 F.3d 638 (2d Cir. 2015) .................................................................................................10

*Picard v. Magliano,*
   42 F.4th 89 (2d Cir. 2022) ....................................................................................................25

*Rodriguez ex rel. Rodriguez v. DeBuono,*
   175 F.3d 227 (2d Cir. 1999) .................................................................................................29

*Seminole Tribe of Florida v. Florida,*
   517 U.S. 44 (1996) ................................................................................................................14

*Sibley v. Watches,*
   501 F. Supp. 3d 210 (W.D.N.Y. 2020) ..................................................................................15

*State Emps. Bargaining Coal. v. Rowland,*
   494 F.3d 71 (2d Cir. 2007) ...................................................................................................15

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ..................................................................................................................6

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ..............................................................................................................10

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ..............................................................................................................14

*Thomas v. Martin-Gibbons,*
   857 F. App'x 36 (2d Cir. 2021) .............................................................................................14

*United States v. Carpio-Leon,*
   701 F.3d 974 (4th Cir. 2012) ................................................................................................20

*United States v. Coombes,*
   2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) ...................................................................18

*United States v. Miller,*
   307 U.S. 174 (1939) ........................................................................................ 28

*United States v. Salerno,*
   481 U.S. 739 (1987) ................................................................................. 16, 25

*United States v. Stevens,*
   559 U.S. 460 (2010) ........................................................................................ 25

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................................ 25

*Washington State Grange v. Washington State Republican Party,*
   552 U.S. 442 (2008) ........................................................................................ 25

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ......................................................................................... 9, 30

**CONSTITUTIONS**

First Amendment ......................................................................................... 8, 22, 25

Second Amendment ........................................................................................ *passim*

Eleventh Amendment ................................................................................... 2, 14-15

Fourteenth Amendment ....................................................................................... 21

**FEDERAL STATUTES**

42 U.S.C.
   § 1983 ............................................................................................................ 14

**STATE STATUTES AND REGULATIONS**

21 Okla. Stat. Ann.
   § 1290.12(A)(2) .............................................................................................. 27

18 Pa. Stat. Ann.
   § 6109 ............................................................................................................ 17

Ala. Code
   § 13A-11-75(a)(1)a ........................................................................................ 17

Alaska Admin. Code
   § 30.070(a)(1)(A) .......................................................................................... 28

Alaska Stat.
   § 18.65.705(6) ................................................................................................27

Ariz. Stat.
   § 13-3112(E)(6) ...............................................................................................27

Ark. Stat.
   § 5-73-309(13) .................................................................................................27

Cal. Penal Code
   § 26165(a)(3), (c) ............................................................................................28

Colo. Rev. Stat. Ann.
   § 18-12-203(2) .................................................................................................17

Colo. Stat.
   § 18-12-203(1)(h)(VI) ......................................................................................27

Conn. Gen. Stat. Ann.
   § 29-28(b) ................................................................................................. 17, 27

Del. Code Ann.
   § 1441(a)(3) ....................................................................................................27

Del. Code
   § 1441(2) .........................................................................................................18
   § 1441(a) .........................................................................................................17

Fla. Stat.
   § 190.06(2)(h)(2)-(4) .......................................................................................27

Ga. Code Ann.
   § 16-11-129(d)(4) ............................................................................................17

Idaho Stat.
   § 18-3302K(4)(c) .............................................................................................27

Ill. Comp. Stat. 66/75(b) ........................................................................................28

Ill. Comp. Stat. Ann.
   § 66/10(a)(4) ...................................................................................................17
   § 66/25(6) .......................................................................................................27

Iowa Stat.
   § 724.9 ............................................................................................................27

Kan. Stat. 75-7c04(b)(1) .........................................................................................27

Ky. Stat.
  § 237.110(4)(i) ...........................................................................................................27

La. Rev. Stat.
  § 1379.3(D) ...............................................................................................................27

Maine Stat.
  § 2003(1)(E)(5) .........................................................................................................27

Mich. Stat.
  § 28.425j ...................................................................................................................27

Minn. Stat.
  § 624.714 ..................................................................................................................27

Mo. Stat. 571.101(2)(10) ...............................................................................................27

Mont. Stat.
  § 45-8-321(3) ............................................................................................................27

N.C. Stat.
  § 14-415.12(4) (effective Oct. 1, 2022) ......................................................................27

N.M. Stat. Ann.
  § 29-19-4(A)(10) ......................................................................................................27
  § 29-19-7A ...............................................................................................................28

2022 N.Y. Laws
  § 26(a) Ch. 371 ...........................................................................................................6
  § 26 Ch. 371 ...............................................................................................................5

N.Y. Penal Law
§ 265.00(10)..............................................................................................................10
§ 400.00(1)................................................................................................................10
§ 400.00(1)(b)..............................................................................................5, 16, 27
§ 400.00(1)(n).............................................................................................................16
§ 400.00(1)(o).............................................................................................................16
§ 400.00(1)(o)(ii) ...........................................................................................2, 5, 16, 18
§ 400.00(1)(o)(iii).........................................................................................................5
§ 400.00(1)(o)(iv).................................................................................................passim
§ 400.00(3)................................................................................................................10
§ 400.00(3)(a) (in force from Nov. 2, 2019, to Apr. 2, 2021) ...............................11
§ 400.00(7) (in force from Nov. 2, 2019, to Apr. 2, 2021) ....................................11
§ 400.00(10)(b) (in force from Nov. 2, 2019, to Apr. 2, 2021) .............................11
§ 400.00(16-a)(a).........................................................................................................11
§ 400.00(16-a)(b).........................................................................................................11
§ 400.00(19)...................................................................................................5-6, 12

Nev. Rev. Stat.
§ 202.3657(3)(c)..........................................................................................................27

Ohio Rev. Code
§ 2923.125..................................................................................................................27

Or. Rev. Stat. Ann.
§ 166.291(1)(f).............................................................................................................27
§ 166.291(4)................................................................................................................18

R.I. Gen. Laws
§ 11-47-11(a).............................................................................................................17
§ 11-47-16..................................................................................................................27

S.C. Code
§ 23-31-215(A)(5).......................................................................................................27

Tenn. Code Ann.
§ 39-17-1366(b)(4)(A)................................................................................................27

Va. Code
§ 18.2-308.02(B).........................................................................................................27

W.Va. Code
§ 61-7-4(e)..................................................................................................................27

Wis. Stat. Ann.
§ 175.60(4).................................................................................................................27

Wyo. Stat. Ann.
  § 6-8-104(b)(vii) ...................................................................................................27

**RULES**

Federal Rule of Civil Procedure 25(d) ....................................................................1

Federal Rule of Evidence 801 ...............................................................................19

Rules of the City of New York 5-12(a) ...............................................................6, 14

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ................................................................15

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 & nn. 121-23 (2009) ......................19

NY Senate Bill S51001 (2021-22 Leg. Sess.) ..........................................................4

Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 156 & n.219 *(2018)*................................................21

Penn. License to Carry, *available at* https://bit.ly/3zJtWaC ................................18

Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7 ......................4

Defendants Governor Kathy Hochul ("Governor"), sued in her official capacity as Governor of the State of New York, Attorney General Letitia James ("Attorney General"), sued in her official capacity as Attorney General of the State of New York, and Acting Superintendent Steven A. Nigrelli[1] ("Superintendent"), sued in his official capacity as Acting Superintendent of the New York State Police (collectively, "State Defendants"), respectfully submit this memorandum of law along with the Declaration of Patrick J. Charles, dated October 20, 2022 ("CD")[2] with exhibits and the Declaration of Todd A. Spiegelman, dated October 21, 2022 ("SD") with exhibits, in opposition to Plaintiff Jonathan Corbett's renewed motion for a preliminary injunction.

## PRELIMINARY STATEMENT

New York enacted the Concealed Carry Improvement Act ("CCIA" or the "Act") to comply with the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022), which invalidated New York's prior "proper cause" requirement for a concealed carry license. The CCIA amended New York's laws related to concealed-carry licenses by requiring certain disclosures that allow a licensing officer to assess whether an applicant would use a weapon in an unreasonably dangerous manner. Additionally, to promote responsible gun use, the CCIA requires applicants to complete safety training courses and live-fire instruction.

Plaintiff in this action again moves for a preliminary injunction against key sections of the CCIA, specifically the requirements that applicants identify character references, list their recently used public social media accounts, and complete two firearms safety training courses (the "Challenged Requirements"). He claims that these reasonable provisions violate the Second

---

[1] Steven A. Nigrelli has replaced Kevin Bruen and is now the Acting Superintendent. Accordingly, Nigrelli should be automatically substituted as a party under Federal Rule of Civil Procedure 25(d).

[2] Patrick Charles, a historical and legal scholar, is the Research Division Supervisor of the U.S. Air Force Historical Research Agency. Mr. Charles has been retained as an expert in this action (in his personal capacity and not on behalf of the U.S. Air Force).

Amendment as interpreted in *Bruen*, but *Bruen* expressly endorsed statutes that, like the CCIA, "require applicants to undergo a background check or pass a firearms safety course . . . to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. 2138 n.9 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

The Court need not reach these constitutional questions, however, because Plaintiff's motion fails at the outset for lack of standing. Plaintiff has no injury fairly traceable to the State Defendants because, as he admits, the New York City Police Department ("NYPD") is the local licensing officer that will decide Plaintiff's pending application for a concealed carry license—not any of the State Defendants. Under controlling Second Circuit precedent, any injury from a future denial of Plaintiff's application may be fairly traced only to the local licensing officer. Plaintiff also lacks standing because he fails to show the requisite "injury-in-fact," *i.e.* that the NYPD has denied his application. It has not been decided yet. And Plaintiff lacks an injury-in-fact as to the character reference and social media disclosure requirements for the additional reason that he applied for a license before those requirements became effective. In other words, Plaintiff may obtain a license without submitting character references or listing his social media accounts.

Additionally, the State Defendants are immune from this suit under the Eleventh Amendment. The *Ex parte Young* exception permitting prospective, injunctive relief against a state official applies only if he or she has some connection to the enforcement of the specific law at issue, but here, the NYPD enforces the Challenged Requirements—not the State Defendants.

Nor has Plaintiff demonstrated a likelihood of success on his constitutional claims. Although he argues the character reference and social media disclosure requirements are standardless, Plaintiff ignores that under the CCIA, licensing officers review these disclosures to determine whether the applicant would use a weapon in a dangerous manner. *See* N.Y. Penal Law § 400.00(1)(o)(ii), (iv).

2

The Supreme Court endorsed similar and even broader standards set forth in other states' laws in *Bruen*. 142 S. Ct. at 2123 n.1. The disclosure requirements also fall comfortably into a long line of historically analogous public safety rules prohibiting the provision of arms to—and requiring the disarmament of—persons found to be dangerous. Further, the CCIA training requirements are contemplated in the Constitution itself (and in the text of *Heller* and *Bruen*) and pale in comparison to the training done for militia service at the time of the Founding.

Lastly, Plaintiff is not suffering from any irreparable, imminent injury sufficient to entitle him to a mandatory injunction because the NYPD will not decide his application for at least a few months. The equities clearly weigh against his request for interim injunctive relief and heavily in favor of New York and its duty to keep weapons out of the hands of those who may use them to harm others through a licensing scheme that ensures permits are granted only to law-abiding and responsible persons. Accordingly, Plaintiff's motion for a preliminary injunction should be denied.

## LEGAL BACKGROUND

### A.  New York State Rifle & Pistol Association v. Bruen

In *Bruen*, the Supreme Court held that the "plain text" of the Second Amendment protects the right of "ordinary, law-abiding citizens" to "'bear' arms in public for self-defense." 142 S. Ct. at 2122, 2135. It ruled that when "the Second Amendment's plain text covers an individual's conduct," the government must demonstrate that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126, 2129-30. But in cases that require this historical analysis, the government need only identify a "historical analogue" that is "relevantly similar" to the challenged regulation—not a "historical twin." *Id.* at 2132-33.

Applying this test, the Court found that a single provision of New York's concealed carry licensing regime was unconstitutional: the requirement that an applicant demonstrate "proper cause"

3

to obtain a concealed carry license, *i.e.*, a showing of a specific self-defense need beyond that of the public at large. *Id.* at 2123.

Significantly, the Court also made clear that "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes," which "often require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9 (cleaned up). It found such measures permissible because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* Some of the "shall-issue" licensing laws the Court explicitly endorsed contain standards aimed at excluding "'individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.'" *Id.* at 2123 n.1 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12 (1984)).

### B.  The CCIA

On July 1, 2022, the CCIA was passed by the New York State Legislature and signed into law by Governor Hochul. The bill was designed "to align with the Supreme Court's recent decision in []*Bruen*," Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7, by eliminating the requirement that applicants for concealed carry licenses demonstrate proper cause.

The Sponsor's Memo of the CCIA bill makes clear that the Legislature was set on complying with *Bruen* by transforming New York into a "shall issue" jurisdiction:

> The proposed legislation creates a new licensing procedure that satisfies the requirements set forth by the United States Supreme Court decision in [*Bruen*]. Notably, this replaces the "proper cause" requirements of New York's current conceal carry law, with a new set of requirements that protects individuals' Second Amendment rights as determined by the Supreme Court. Under this bill, applicants who successfully meet New York's conceal carry license applications requirements will receive their license.

*See* NY Senate Bill S51001 (2021-22 Leg. Sess.), Sponsor Memo.

Under the CCIA, a concealed carry license shall be issued to an applicant subject to a

background check involving an in-person interview, criminal history review, and the applicant's submission of character references and a list of recent social media accounts. A licensing officer reviews this material to determine whether the applicant satisfies the eligibility criteria for a license.

One such criterion (which had existed long before *Bruen*) is that the applicant be "of good moral character." Penal Law § 400.00(1)(b). The CCIA clarified that "good moral character" means "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," *i.e.*, only for lawful self-defense. Penal Law § 400.00(1)(b). To this end, the CCIA requires applicants to submit the "names and contact information of no less than four character references who can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." *Id.* § 400.00(1)(o)(ii). Applicants must also provide "a list of former and current social media accounts . . . from the past three years to confirm" that information. *Id.* § 400.00(1)(o)(iv). There is no requirement that an applicant submit their social media passwords to the licensing officer or disclose social media postings that are not available to the public.

The CCIA also requires applicants to complete sixteen hours of in-person safety training courses as well as a two-hour live fire range training course. *Id.* § 400.00(19). Applicants must submit a certificate that they have completed these trainings. *Id.* § 400.00(1)(o)(iii).

The Act's amendments to New York's licensing statute went into effect on September 1, 2022. Ch. 371, 2022 N.Y. Laws § 26. Most of the amendments, including the character reference and social media disclosure requirements "apply only to licenses for which an application is made

on or after" September 1, 2022. *Id.* § 26(a).[3]

### C. The Decisions in Antonyuk v. Bruen and Antonyuk v. Hochul

In *Antonyuk v. Bruen*, 22-cv-0734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ("*Antonyuk I*"), plaintiffs—Ivan Antonyuk and gun rights organizations—sued the Superintendent, bringing a broader challenge to the CCIA than Plaintiff does here. Plaintiffs there moved for a preliminary injunction. *Id.* at *1.

The court dismissed the action for lack of standing and denied plaintiffs' motion for a preliminary injunction. *Id.* The court held that most of the requirements challenged could not be traced to the Superintendent but found that the training requirements were fairly traceable to him because he is one of the officials who approves the training curriculum and proficiency standards. *Id.* at *12-13. The court nonetheless ruled that the individual plaintiff lacked standing as to those claims, apparently because he did not allege a concrete injury from the training requirements. *Id.* at 13 n.8.[4]

On September 20, 2022, plaintiff Antonyuk filed a new lawsuit attacking largely the same CCIA provisions as before, dropping the organizational plaintiffs and adding five other individual plaintiffs. *Antonyuk v. Hochul*, No-22-cv-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*"). The *Antonyuk II* plaintiffs added the Governor and municipal officials as defendants

---

[3] The training requirements, however, apply to applications submitted before September 1, 2022. *See* Penal Law § 400.00(19). Thus, NYPD rules provide that applications filed before that date "must affirm that [the applicants] have completed the live firearms safety training course." Rules of the City of New York § 5-12 (a)(4).

[4] Despite the *Antonyuk I* court's finding that it "lacks-subject matter jurisdiction," 2022 WL 3999791, at *24, the opinion nonetheless contains an advisory section following the court's dismissal of the action for lack of standing that discusses plaintiffs' likelihood of success on the merits. The court expressly stated that this section was "judicial dictum . . . not essential to the Court's decision." *Id.* at *25. It opined that plaintiffs were unlikely to succeed on their challenge to the firearms training requirement and that the character reference requirement was not unconstitutionally burdensome. *Id.* at *30-31. However, the court criticized other aspects of the CCIA. The merits section of the *Antonyuk I* decision has no precedential weight because a court acts "ultra vires" when it assumes "[h]ypothetical jurisdiction" so as "to pronounce upon the meaning or the constitutionality of a state" statute. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998); *see also Pan v. Whitaker*, 351 F. Supp. 3d 246, 249 (E.D.N.Y. 2019) ("no court has the power to address the merits of a case in the absence of subject matter jurisdiction").

but did not name the Attorney General. *Id.* at *2.

On October 6, 2022, the court issued a Decision and Temporary Restraining Order temporarily blocking many aspects of the law, including the State's prohibition on carrying weapons in sensitive locations, such as public transit, summer camps, and Times Square. *Id.* at *13-20. As relevant here, the court conducted a brief standing analysis and found the Superintendent to be a proper party for the reasons stated in *Antonyuk I. Id.* at *7. The court also assumed that Governor Hochul was properly named but stated that it "may ultimately find that [she] is not a proper party" and referenced firearms licensing cases where she was dismissed as a defendant. *Id.* at *7 & n.9. On the merits, the court denied a TRO as to the firearms training and character reference requirements. *Id.* at *11-12. It also largely denied the TRO as to the good moral character requirement, keeping it in place to the extent the requirement is based on an applicant's conduct and does not prohibit lawful self-defense. *Id.* at *9-10. The court restrained enforcement of the social media disclosure requirement, however, based on a perceived lack of historical analogues. *Id.* at *12.

On October 12, 2022, the Second Circuit granted the *Antonyuk II* state defendants' request for an interim administrative stay of the district court's TRO and referred their motion to stay pending appeal to a motions panel. *Antonyuk v. Hochul*, No-22-cv-0986, ECF No. 39. The stay motion and appeal are both pending.

## FACTUAL BACKGROUND

### A. Plaintiff's Claims in this Lawsuit

Plaintiff avers that he applied to the NYPD for a concealed carry license application on April 14, 2022. Affidavit of Jonathan Corbett, dated September 27, 2022 ("Pl. Aff.") ¶ 3, ECF No. 49. The NYPD allegedly informed him that an officer will not be assigned to review his application for about nine months. *Id.* ¶ 6.

Plaintiff does not claim that the State Defendants have any role in reviewing or deciding his license application and, in fact, concedes that "the NYPD is the appropriate—and only—agency empowered by law to accept such an application and grant such a license to him." Plaintiff's Renewed Motion for Preliminary Injunction With Memorandum ("Pl. Mem.") at 5, ECF No. 48.

Plaintiff filed this lawsuit on July 11, 2022, naming only Governor Hochul as a defendant and later moved for a preliminary injunction. After the Governor made clear in opposition that she was not a proper defendant, Plaintiff filed the Amended Complaint naming the State Defendants as well as three New York City officials. Like the original complaint, the Amended Complaint brings a facial challenge under the Second Amendment to Challenged Requirements. Plaintiff also claims that the social media requirement violates his right to free speech under the First Amendment. Notably, Plaintiff does not challenge the "good moral character" requirement nor assert any as-applied challenges, and he expressly states that he is not challenging the processing time for obtaining a license. Pl. Mem. at 10 n.12. Plaintiff names the Governor and Attorney General as defendants in his claims against each of the Challenged Requirements but names the Superintendent only with respect to the firearms safety training requirement. Am. Compl. ¶¶ 60-69.

On September 13, 2022, the Court denied Plaintiff's first motion for a preliminary injunction without prejudice in light of his filing the Amended Complaint and set a briefing schedule should Plaintiff file a renewed motion. Order, ECF No. 32. Plaintiff filed this renewed motion on September 27, 2022. State Defendants oppose.

### B.  The Denial of Plaintiff's Prior Application for a Concealed Carry License

Plaintiff previously applied to the NYPD for a concealed carry license in December 2015. *See Corbett v. City of New York*, 2019 WL 2502056, at *1 (S.D.N.Y. June 17, 2019). He refused to answer three application questions: have you ever (1) "Been discharged from employment;" (2)

"Used narcotics or tranquilizers;" and (3) been involved as a witness in any hearing or inquiry. *Id.* at *2. In a "letter of necessity" requiring the applicant to set forth a detailed justification for a license, Plaintiff wrote that he "conducts business as a civil rights advocate" and "[i]n order to exercise his civil rights fully, he needs a carry license." *Id.* The NYPD denied Plaintiff's application for failure to complete it and to demonstrate proper cause. *Id.* at *3.

Plaintiff filed an Article 78 proceeding against New York City challenging the denial of his license application. The court dismissed all claims for failure to state a cause of action and the Appellate Division affirmed. *Corbett v. City of New York*, 2017 WL 550191, at *1 (Sup. Ct. N.Y. Cty. Feb. 7, 2017), *aff'd*, 160 A.D.3d 415 (1st Dep't 2018), *lv. denied*, 31 N.Y.3d 913 (2018).

Plaintiff then brought a similar federal action against New York City. The district court dismissed the complaint on *res judicata* grounds and for failure to state a claim, and the Second Circuit affirmed. *Corbett*, 2019 WL 2502056, at *6, *aff'd*, 816 F. App'x 551 (2d Cir. 2020).

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The burden is on Plaintiff to establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Cases such as this one, where a plaintiff asks the Court to enjoin a duly enacted statute, require "a heightened showing . . . consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'" *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). Plaintiff must show a "clear"

or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm. *People ex. rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015).

**ARGUMENT**

## I.   PLAINTIFF LACKS STANDING TO SUE

To have standing to sue in federal court, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiff has not met his burden to establish standing.

### A.   Plaintiff's Alleged Injuries Are Not Fairly Traceable to the State Defendants

Under New York's firearms licensing laws, only a "licensing officer" in the locality where an applicant resides or has a business may issue a concealed carry license. Penal Law § 400.00(1), (3). In New York City, the licensing officer is the NYPD Commissioner. *Id.* § 265.00(10).

To satisfy "the irreducible constitutional minimum of standing" a plaintiff must demonstrate that his injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). In *Libertarian Party of Erie Cnty. v. Cuomo*—a Second Circuit case directly on point—two plaintiffs had their pistol license applications denied by two judges who were local licensing officers. 970 F.3d 106, 122 (2d Cir. 2020), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111.[5] The plaintiffs brought claims against the judges, the Governor, the Attorney General,

---

[5] The *Bruen* decision abrogated the Second Circuit's decision in *Libertarian Party*, 970 F.3d 106, only to the extent *Libertarian Party* (1) upheld New York's "proper cause" requirement under the Second Amendment; and (2) applied "means-ends" scrutiny to plaintiffs' Second Amendment challenge. *Bruen*, 142 S. Ct. at 2127 & n.4. The Second Circuit's decision otherwise remains controlling precedent, including its rulings relating to the circumstances in which an applicant for a firearms license may, or may not, have standing to sue.

and the Superintendent. *Id.* at 114. The Second Circuit affirmed dismissal of all claims against these three State officials because "the only defendants to whom [plaintiffs'] alleged injuries were fairly traceable were the judges who denied their respective applications." The other defendants were not alleged to have had any role in considering plaintiffs' applications or in issuing licenses. *Id.* at 122.

So too here. Plaintiff lacks standing to sue the State Defendants because they have no role in deciding his application. The Licensing Division of the NYPD, a New York City agency, will review Plaintiff's application and determine whether or not to issue Plaintiff a license. Thus, under controlling authority, the State Defendants are clearly improper parties.[6]

To be sure, in *Antonyuk I*, the court found the CCIA's firearms training requirement to be fairly traceable to the Superintendent because he is one of the State officials who approves the training curriculum and proficiency standards for the live-fire course. 2022 WL 3999791, at *12-13.[7]

But the court's analysis was flawed. For one thing, it did not directly address the Second Circuit's contrary holding in *Libertarian Party*. While the earlier version of the licensing law the Second Circuit analyzed there did not include a training requirement, the law set forth many responsibilities of the Superintendent. *See* Penal Law § 400.00(3)(a), (7), (10)(b) (in force from Nov. 2, 2019, to Apr. 2, 2021) (Superintendent approved form of license applications, licenses, and recertifications); *id.* § 400.00(16-a)(a) (requiring registration of certain weapons with Superintendent who determines whether registrant was prohibited from ownership); *id.* § 400.00(16-a)(b) (requiring Superintendent to educate public about illegal weapons). Despite the Superintendent's significant role under the predecessor law, the Second Circuit dismissed him from plaintiffs' broad challenge

---

[6] Plaintiff should be aware of this given that he already brought two actions against the City of New York—not the State—for denying his 2015 concealed carry license application.

[7] As to Governor Hochul, the court in *Antonyuk II* failed to provide any analysis as to why she might be a proper party and actually suggested that she was improperly named. 2022 WL 5239895, at *7.

because he did not decide licensing applications. *Libertarian Party*, 970 F.3d at 122.[8]

Plaintiff's alleged injuries also cannot be fairly traced to the Superintendent because he does not claim any injury from the content of the curriculum. He challenges the amount of the fees that he speculates he may incur in taking the training, and the fact that it lasts 18 hours. Am. Compl. ¶¶ 48-54; Pl. Aff. ¶ 12 ("I do not intend to waste another 18 hours of my life taking New York training courses."). But the hourly requirement and any fees charged are entirely unrelated to the Superintendent's actions. The CCIA explicitly sets forth the minimum length of the required training. Penal Law § 400.00(19). And there is no allegation that the Superintendent, apart from being obligated to approve the curriculum, has any role in setting the fee rates.[9] In short, as with the Governor and Attorney General, Plaintiff's injuries are not fairly traceable to the Superintendent.

### B.  Plaintiff Has Not Suffered a Concrete "Injury-in-Fact"

Plaintiff also lacks standing because he fails to show a concrete injury-in-fact. His application for a concealed carry license has not been denied; the NYPD is currently reviewing it. And Plaintiff cannot show that completing the application process would be futile because he may well be granted a license if he opts to satisfy the Challenged Requirements.

In a challenge to a licensing statute, the license application "denial is [the] distinct injury." *Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) ("the formal process of application and denial . . . makes the injury to Heller's alleged constitutional interest concrete and particular"), *aff'd sub nom.*, *Heller*, 554 U.S. 570. Thus, in *Libertarian Party*, the Second Circuit stated that "[i]n order

---

[8] The *Antonyuk I* court's "fairly traceable" analysis was also ultra vires because the court found the individual plaintiff had not established an injury-in-fact sufficient to show standing. 2022 WL 3999791, at *15.

[9] The Superintendent was a defendant in the *Bruen* Supreme Court case ruling on New York's "proper cause" standard. But neither the Supreme Court nor the lower courts considered whether the plaintiffs' alleged injuries were fairly traceable to him, likely because plaintiffs also named a licensing officer who made a final decision denying their applications. In *Antonyuk I*, the court recognized that *Bruen* did not address this issue. 2022 WL 3999791, at *11.

to challenge the New York firearm licensing laws, a person must either have applied for and been

denied a license or make a 'substantial showing' that his or her application would have been futile."

970 F.3d at 116 (only plaintiffs who had their applications denied alleged an injury-in-fact).

Plaintiff here has not made a "substantial showing" that completing his application and

obtaining a decision would be futile. A plaintiff may show futility where it is clear that his or her

application would be denied based on immutable characteristics or, at the very least, characteristics

that are not easily altered. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365-66 (1977)

(minority persons deterred by "Whites Only" employment policy would suffer injury); *Bach v. Pataki*,

408 F.3d 75, 82-83 (2d Cir. 2005) (plaintiff's application for a concealed carry license was futile

where he was not a New York resident and thus statutorily ineligible), *overruled on other grounds by*,

*McDonald v. Chicago*, 561 U.S. 742 (2010). In contrast, a plaintiff fails to demonstrate futility where he

or she opts not to complete an application despite being able to do so. This is because "a plaintiff

must submit to the challenged policy" and a "[m]ere objection or antipathy to the law" does not

constitute futility. *Libertarian Party*, 970 F.3d at 121, 116; *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091,

1097-98 (2d Cir. 1997) (plaintiff inmate did not show futility in challenge to prison's religious

worship policy where he did not complete a registration form but could have done so).[10]

Here, Plaintiff avers that he does not intend to take any firearms safety training courses,

disclose anonymous speech, or submit four character references. Pl. Aff. ¶¶ 11-12. Plaintiff could of

course fulfill these requirements, but he chooses not to. However, Plaintiff can and must fully

---

[10] In *Antonyuk II*, the court held that one plaintiff, Lawrence Sloane, who had not even applied for a license nonetheless had standing under the futility doctrine because he alleged that if he applied, he would refuse to provide character references, social media accounts, or other requirements for obtaining a license. 2022 WL 5239895, at *8; *Antonyuk II* Compl. ¶ 225. But in its brief discussion of this issue, the court overlooked the high bar for showing futility and the Second Circuit's clear language in *Libertarian Party* that antipathy to a law does not satisfy it. The *Antonyuk II* court also found plaintiff Sloane demonstrated futility because (assuming he applied for a license), the sheriff would not begin considering it until October 2023. However, unlike Sloane, Plaintiff here only raises a facial challenge and expressly states that "this lawsuit does not currently challenge the processing time" for obtaining licenses. Pl. Mem. at 10 n.12.

13

submit to the challenged policy by awaiting a decision on his licensing application whether or not he submits the required information. His apparent refusal to comply with the law does not make his application futile, and consequently, he lacks standing.[11]

Plaintiff also fails to allege an injury in fact from the character reference and social media disclosure requirements because he is not required to submit that information. The NYPD has made clear that except for the training requirements, applications filed on or before August 31, 2022—like Plaintiff's—will not be reviewed under the CCIA's standards. RCNY 5-12(a).

## II.   THE ELEVENTH AMENDMENT BARS PLAINTIFF'S CLAIMS AGAINST THE STATE DEFENDANTS

The Eleventh Amendment prohibits lawsuits in federal court against a state without the state's waiver of immunity or valid abrogation by Congress. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54-55 (1996). This immunity includes suits like this one "against state officials in their official capacities." *Li v. Lorenzo*, 712 F. App'x 21, 22 (2d Cir. 2017). "New York has not waived its immunity . . . under 42 U.S.C. § 1983," nor did Congress abrogate State immunity in enacting that statute. *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021). To be sure, *Ex parte Young*, 209 U.S. 123 (1908), creates an exception to Eleventh Amendment immunity that permits suits for prospective injunctive relief against state officials for ongoing violations of federal law. However, that narrow exception only applies if "the state officer against whom a suit is brought" has "'some connection with the enforcement of the act' that is in continued violation of federal law." *In re Dairy Mart Convenience Stores*, 411 F.3d 367, 372-73 (2d Cir. 2005) (quoting *Ex parte Young*, 28 S. Ct. at 157).

Applying this principle, courts in this Circuit have repeatedly held that State officials were

---

[11] Plaintiff does not claim that he will engage in any criminal conduct. Accordingly, he cannot assert a pre-enforcement challenge, which is only permitted where a plaintiff intends "to engage in a course of conduct . . . proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

immune from lawsuits challenging firearm restrictions because they lacked a specific enforcement role. *See Sibley v. Watches*, 501 F. Supp. 3d 210, 234 (W.D.N.Y. 2020) (Governor); *Aron v. Becker*, 48 F. Supp. 3d 347, 368 (N.D.N.Y. 2014) (same); *Osterweil v. Bartlett*, 819 F. Supp. 2d 72, 75 (N.D.N.Y. 2011) (Governor and Attorney General), *vacated on other grounds by*, 738 F.3d 520 (2d Cir. 2013).

 Here, as discussed above, State Defendants do not enforce the Challenged Requirements. That is the role of local licensing officers who decide applications. Thus, the *Ex parte Young* exception does not apply, and State Defendants are immune from suit.[12]

 Notably, courts have consistently held that an official's "general duty to enforce or execute the law is insufficient to overcome Eleventh Amendment immunity." *Sibley*, 501 F. Supp. 3d at 234; *see also Citizens Union of the City of New York v. Attorney General of New York*, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017) (collecting cases) ("'a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute.'"). Thus, the Governor's role as chief executive, the Attorney General's role as chief law enforcement officer, and the Superintendent's general role in enforcing the New York's criminal laws (*see* Am. Compl. ¶¶ 8, 13, 56) do not render them proper defendants or abrogate their Eleventh Amendment immunity.[13]

## III. PLAINTIFF HAS NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

 Plaintiff brings a facial challenge to the CCIA, but those "are generally disfavored." *Dickerson*

---

[12] Although the Superintendent is mentioned in the CCIA's training requirement provision, he does not enforce the law, *i.e.* he does not determine whether someone has complied with the training requirements such that they should be granted or denied a license. *See* Black's Law Dictionary (11th ed. 2019) (defining "enforcement" as "[t]he act or process of compelling compliance with the law.").

[13] To the extent Plaintiff seeks to hold the Governor liable for her role in pressing for the CCIA in response to the *Bruen* decision, convening the Legislature to pass it, and signing it into law (rather than her supposed enforcement role), she is protected by legislative immunity. *See Bogan v. Scott Harris*, 523 U.S. 44, 55 (1998) (absolute legislative immunity extends to executive branch official "when they perform legislative functions" such as introducing and enacting legislation); *State Emps. Bargaining Coal. v. Rowland*, 494 F.3d 71, 90 (2d Cir. 2007) (legislative immunity protects officials against official capacity claims to the extent such claims do not relate to statutory enforcement).

*v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). To prevail on such a challenge, Plaintiff must show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Given this standard, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Id.* Plaintiff plainly fails to meet this high bar with respect to each of the Challenged Requirements.

### A. The Character Reference Requirement is Constitutional

> 1. <u>The Requirement Is Part of a Background Check Used to Determine Dangerousness That Is Endorsed by Bruen</u>

The requirement that an applicant submit four character references is part of a background check that also includes an in-person interview, submission of information about the applicant's criminal history and living situation, and disclosure of public social media accounts. Penal Law § 400.00(1)(n), (o). The background check is designed to ensure that licensing officials are provided with information about an applicant's associates, behavior, and demeanor critical to determining his or her fitness to possess a firearm. Plaintiff's claim that "[t]he law sets no standard whatsoever" for the licensing official's review of the disclosure requirements is thus flatly wrong. Pl Mem. at 8-10. The licensing officer reviews the disclosures to determine whether an applicant has the good moral character to use a weapon responsibly and not in a dangerous fashion. Penal Law § 400.00(1)(b) (good moral character); *id.* § 400.00(1)(o)(ii), (iv) (incorporating good moral character and dangerousness standards into character reference and social media disclosure requirement). Notably, the Second Circuit held that a more broadly worded, pre-CCIA version of the good moral character standard was comprehensible and that examples of its proper application "are not beyond an ordinary person's comprehension; nor are they rare." *Libertarian Party*, 970 F.3d at 126.

Laws like those challenged here that prevent dangerous people from acquiring or possessing

weapons are entirely in keeping with *Bruen*. The *Bruen* Court endorsed the laws of dozens of "shall issue" jurisdictions that "often require applicants to undergo a background check." 142 S. Ct. at 2138 n.9; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo fingerprinting, a background check . . . and training in firearms handling . . ."). And background checks are permissible when, as here, they are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" to whom the Second Amendment's protections extend. *Id.* at 2138 n.9.

At least three "shall-issue" jurisdictions specifically endorsed in *Bruen*—Connecticut, Rhode Island, and Delaware—have enacted laws that appear to confer significantly more discretion on licensing officers in conducting background checks than does the CCIA. *Id.* at 2123 n.1. These states' laws consider applicants' "suitability" or "good moral character" and—unlike the CCIA—do not further define those terms in the statutes. Conn. Gen. Stat. Ann. § 29-28(b) (suitable person); R.I. Gen. Laws § 11-47-11(a) (same); Del. Code Tit. 11 § 1441(a) (good moral character); *see also* Ga. Code Ann. § 16-11-129(d)(4) (same). Moreover, in at least four other shall-issue jurisdictions— Alabama, Colorado, Illinois, and Pennsylvania—officials review licensing applications under dangerousness standards that are quite similar to the CCIA's. Ala. Code § 13A-11-75(a)(1)a; (sheriff should deny permit where he "has a reasonable suspicion that the person may use a weapon" in such "manner that would endanger the person's self or others."); 430 Ill. Comp. Stat. Ann. § 66/10(a)(4) (denying permit if applicant "pose[s] a danger to himself, herself, or others"); Colo. Rev. Stat. Ann. § 18-12-203(2) (sheriff may deny permit if he has a "reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others."); 18 Pa. Stat. Ann. § 6109 (not issuing license to "[a]n individual whose character and reputation is such that" he "would be likely to act in a manner dangerous to public safety.").

With respect to the CCIA's character reference requirement in particular, the laws and policies of several "shall-issue" jurisdictions require applicants to submit statements from third parties attesting to their character. *See, e.g.*, 11 Del. Code § 1441(2) (requiring certificate signed by five respectable citizens attesting to character); Or. Rev. Stat. § 166.291(4) (requiring two character references); Application for Penn. License to Carry, *available at* https://bit.ly/3zJtWaC (same).

The *Antonyuk II* court denied a TRO as to the CCIA's character reference requirement, reasoning that "it is difficult to imagine the absence" of a "need to *verify* the statements made in the application (through one or more character references)." 2022 WL 5239895, at *11-12; (court cannot imagine "application without character references"). Indeed, these references must be able to "attest to the applicant's good moral character," as a way of informing that determination. Penal Law § 400.00(1)(o)(ii). That is their point. Plaintiff does not challenge the good moral character requirement itself, which the *Antonyuk II* court permitted to be enforced to the extent it is based on an applicant's conduct and permits lawful self-defense.[14]

In sum, the CCIA's character reference requirement is consistent with the Second Amendment and with similar provisions in other shall-issue jurisdictions. Notably, the Supreme Court endorsed these regimes without reference to historical analogues, which "suggests the continued validity of [such] regulations . . . without conducting a historical analysis." *United States v. Coombes*, 2022 WL 4367056, at *9 (N.D. Okla. Sept. 21, 2022).

     2.   <u>Refusing Weapons to Individuals Found to be Dangerous Follows Longstanding Anglo-American Traditions</u>

---

[14] To be clear, the court erred in revising this provision to require a finding of "good moral character" based solely on the applicant's conduct and under a preponderance of the evidence standard. 2022 WL 5239895, at *9. Other shall-issue jurisdictions, like Connecticut, Rhode Island, and Delaware, have similar requirements without a "preponderance of the evidence" standard. In any event, the court's alterations in *Antonyuk II* do not affect the character reference requirement, which itself focuses on the applicant's prior conduct and whether it evidences a propensity towards dangerousness.

If a historical analysis is needed, it supports New York's background check, including the character reference requirement. Background checks assessing a potential gun owner's propensity to violence find much support in Anglo-American legal tradition. As Justice Barrett—who was in the *Bruen* majority—wrote in a Seventh Circuit dissenting opinion: "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J. dissenting).

"[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms." Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 & nn.121-23 (2009).[15] In the period between the establishment of colonies in America and the Revolutionary War, both the colonial governments and the English monarchy did not hesitate to disarm persons based on a finding that the person would be likely to use a weapon in a manner injurious to the public welfare. Indeed, "not one historian or legal scholar has found any substantiated historical evidence that the right to arms, like other rights, could not be subjected to reasonable regulation or that persons deemed dangerous to the community could not be restricted in their right to arms in the interest of public safety." CD ¶ 15 (citing early American treatises).

From the early days of English settlement in America, the colonies sought to prevent Native American tribes from acquiring firearms, passing laws forbidding the sale and trading of arms to Indigenous people.[16] *See, e.g.* SD Ex. 1. Colonial governments also directly regulated gun ownership

---

[15] To the extent that any of the reports or scholarly articles cited in this memorandum may be considered hearsay under Federal Rule of Evidence 801, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

[16] Although these laws reflect the broad pre- and post-Founding understanding that gun possession could be restricted where a person was dangerous or unfit, some are based on racial or religious animus that is repugnant to a modern understanding of the Constitution. A clear-eyed look at American history and doctrine will necessarily reveal episodes

of individuals believed to be unfit. The Massachusetts Bay Colony, for instance, issued an order in 1637 disarming the followers of a dissident preacher because there was "just cause of suspition that they . . . may, upon some revelation, make some suddaine irruption upon those that differ from them in judgment." SD Ex. 2. Likewise, King Charles II of England passed the Militia Act of 1662, which authorized royal officials to "search for and seize all arms in the custody or possession of any person or persons whom the said Lieutenant or two or more of their deputies shall judge dangerous to the peace of the Kingdom." SD Ex. 3.

And even after the English Bill of Rights established a right of the people to arm themselves, the right was only given to Protestants, based on a continued belief that Catholics were likely to engage in conduct that would upset the peace. *See* SD Ex. 4. Virginia followed this example, passing an act in 1756 disarming all Catholics or "reputed Papists" who refused to take an oath of loyalty to the colonial government because "it is dangerous at this time for Papists to be armed." SD Ex. 5.[17] It was thus commonly understood at the time of the Second Amendment's ratification that if authorities believed an individual threatened the public by virtue of that person's associations or reputation, authorities could strip that person of his right to bear arms. *See United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) ("Colonial governments often barred 'potential subversives' from owning firearms.").

In the Revolutionary era, colonies frequently disarmed individuals based on their reputation for being disloyal to the new American nation. Massachusetts, for instance, had a law "disarming such person as are notoriously disaffected to the cause of America." SD Ex. 6; *see also Carpio-Leon*,

---

that are shameful but nonetheless relevant, as *Bruen* shows. *See* 142 S. Ct. at 2150. Of course, if a modern instance were to arise where gun licensing requirements were applied discriminatorily, they could be struck down as unconstitutional.
[17] As with its English analogues, Virginia's Act deemed someone a "reputed Papist" if two or more justices of the peace knew or suspected that person was Catholic. *Id.* at 36.

701 F.3d at 980 (noting that Massachusetts required participants in Shays' Rebellion to give up their firearms for three years).  In a Pennsylvania law passed in 1776, all white male inhabitants were required take a prescribed oath of allegiance, and if they failed to do so, were disarmed. SD Ex. 7.

Later, in the period before and after the ratification of the Fourteenth Amendment, Congress and the states began to implement firearms licensing regimes involving a determination of whether an individual was potentially dangerous. *See, e.g.*, Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 & n.219 (2018) (collecting ordinances from more than two dozen cities, passed between the mid-19th century and early 20th century, requiring a permit to carry firearms in cities across the United States subject to the discretionary determination of an official). A key requirement of these licensing laws was that the individual applying for the license be a "peaceable citizen," have "good moral character," or be "law-abiding." *See* CD ¶¶ 21-23 & Exs. B-G. With respect to character references in particular, Reconstruction-era ordinances (and earlier laws) required individuals who wished to carry a gun to submit "written endorsements" or "recommendations from reputable citizens or law enforcement officials. *Antonyuk II*, 2022 WL 5239895, at *11 n.22 (collecting laws).

Each of these sets of precedents is "relevantly similar" to the dangerousness assessment a licensing officer makes in reviewing the applicant's character references and social media disclosures. 142 S. Ct. at 2132. Plaintiff's unsupported claim that these requirements have no historical analogue from the 1700s and 1800s is simply wrong. *See* Pl. Mem. at 7-8.

To be sure, not every historical measure included character references. But that is not the test. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional

21

muster." *Bruen* 142 S. Ct. at 2133 (emphasis in original).

New York's licensing requirements, including the character reference requirement, are actually *more* solicitous of an applicant's right to bear arms. Unlike its precursors that relied on gross generalizations of irresponsibility or dangerousness associated with lineage, religion, or perceived disloyalty, New York's law disqualifies applicants based on an individualized determination of their good moral character and gives the applicant control to select four references who can attest to it.

**B.    The Social Media Requirement is Constitutional**

Like character references, an applicant's disclosure of social media accounts furthers New York's historically grounded assessment of dangerousness. In temporarily restraining the social media requirement, the *Antonyuk II* court ignored the historical analogues cited above and improperly sought a "historical twin." This critical requirement should be upheld under the Second Amendment, and has a legitimate sweep under the First Amendment in protecting the public from those who would likely use a weapon in a dangerous fashion.

1. The Requirement is Constitutional Under the Second Amendment

The social media disclosure is meant only to "confirm the information regarding the applicant's character and conduct" provided by an applicant's character references. Penal Law § 400.00(1)(o)(iv). Accordingly, the information is reviewed as part of the dangerousness assessment discussed above and is well-grounded in *Bruen* and longstanding traditions. *See supra* pt. III(A).

Nonetheless, after a short discussion, the *Antonyuk II* court temporarily restrained enforcement of the requirement finding that defendants had "adduced no historical analogues requiring persons to disclose the pseudonyms they have used while publishing pamphlets or newspaper articles." 2022 WL 5239895, at *12. That decision is subject to an interim stay entered by the Second Circuit and is flawed in any event. First, the court extolled the character reference

22

requirement because it verified other information provided in the application, but that is also the purpose of the social media disclosure. Second, the court sought a historical "dead ringer." But *Bruen* expressly disavows that standard. 142 S. Ct. at 2133. Instead, the court should have considered "why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* The social media requirement is meant to prevent objectively dangerous individuals from obtaining firearms, which is the same purpose underlying the historically analogous laws discussed above.

The Founders did not have social media, but that of course does not make the CCIA's requirement unmoored from historical precedents. *See id.* at 2132 (cases implicating "dramatic technological changes may require a more nuanced approach"). For example, loyalty oaths were a tool the Founders used to try to uncover the colonists' potentially dangerous beliefs. Thus, Pennsylvania justified its law requiring all white male inhabitants to swear allegiance on pain of disarmament by observing that "sundry persons" had "sordid and mercenary motives" to "withhold their service and allegiance" while others "rendered great and eminent service in defence and support of . . . independence." SD Ex. 7. Loyalty oaths were necessary to determine who held dangerous, treasonous beliefs and who did not because these "sorts of persons remain at this time mixed and in some measure undistinguished from each other." *Id.* The loyalty oaths are a relevant analogue to the extent they sought to uncover a hidden propensity for dangerous behavior.

New York's social media disclosure requirement is, in fact, a critical factor in determining whether an applicant intends to threaten others. This is because a social media posting—perhaps even more than the other required disclosures—may reveal specific threats or indicators of violence that demonstrate an intent to use a weapon aggressively. This is not speculative: again and again, people who commit mass shootings leave a long trail of disturbing content on their social media accounts, often posted well before they legally purchase the guns used to commit their atrocities. For

instance, a committee of the Texas House of Representatives found that in the year before his attack, the Uvalde shooter "began to demonstrate interest in gore . . . sometimes sharing gruesome videos and images of suicides, beheadings, accidents, and the like." SD ¶ 13. His comments about school shootings earned him the nickname 'Yubo's school shooter'" on that social media platform.  All of this activity took place before the shooter bought his gun, legally, when he turned 18. *See id.*

The Parkland, Florida shooter posted photos of himself with masks and guns, in body armor, showing off his arsenal of weaponry, and "posted pictures and videos of deceased animals, killing squirrels and shooting at alligators in the eyes" on Snapchat. SD ¶ 14. On YouTube, he announced "Im [*sic*] going to be a professional school shooter" just five months before he carried out his attack. This and all of the other comments he made on YouTube were publicly available. SD ¶ 15. And the shooter who killed ten people in Buffalo this May posted on social media networks Discord and 4Chan about where and when he would launch his attack. SD ¶ 16. Some of these posts were made under a pseudonym. SD ¶ 17.

Plaintiff flatly claims that social media disclosure will have "no benefit to public safety." Pl. Mem. at 2. But there is an obvious benefit to discouraging or preventing a would-be mass shooter from obtaining a license because they would have to disclose a violent or threatening social media account. And while Plaintiff is certain that every mass shooter will "simply lie[] on their application," *id.* at 1, he provides no evidence to support that claim, and ignores that other information disclosed may lead a licensing officer to troublesome material an applicant tried to hide. Contrary to Plaintiff's claims, preventing a mass shooter or anyone else who would use a weapon aggressively to harm others is, in fact, the chief purpose of the social media requirement. An applicant's social media could potentially reveal "several sound bases . . . for denying" his "request to possess a firearm" such as "threats to harm others" and "repeatedly reckless conduct

24

with a weapon while intoxicated." *See Libertarian Party*, 970 F.3d at 126. Because there are plainly

constitutional applications of the requirement, it should be upheld. *Salerno*, 481 U.S. at 745.

        2.    <u>The Requirement Is Constitutional under the First Amendment</u>

For Plaintiff to prevail on his First Amendment facial challenge to the social media

requirement, he must establish 'that no set of circumstances exists under which [the challenged

statute] would be valid' or that the statute lacks any 'plainly legitimate sweep.'" *Picard v. Magliano*, 42

F.4th 89, 101 (2d Cir. 2022) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). Plaintiff

conjures exaggerated hypotheticals of individuals he claims could be improperly affected by the

requirement, including a "gay person struggling to come out," or one "who sells nude pictures of

themselves online." But he cannot prevail on a facial challenge based on such conjecture because "in

determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial

requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State Grange v.*

*Washington State Republican Party*, 552 U.S. 442, 449 (2008). And Plaintiff's case here is entirely

hypothetical because Plaintiff himself need not submit his social media accounts. *See infra* pt. I(B).

Turning to traditional First Amendment analysis, the social media disclosure requirement is

content neutral in that it simply requires disclosure of a list of accounts, regardless of their

substance, and was adopted to prevent gun violence, not "because of disagreement with the message

[] covey[ed]." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see Doe v. Harris*, 772 F.3d 563,

567 (9th Cir. 2014) (finding California law requiring sex offenders to disclose a list of internet

identifiers to be content neutral because it did not prohibit the use of "particular websites, or any

particular type of communication"). Intermediate scrutiny is thus appropriate here, under which the

challenged measure must be "narrowly tailored to serve a significant governmental interest," but

need not be "'the least restrictive or least intrusive means of achieving the stated governmental

interest.'" *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) (cleaned up).

The requirement comfortably passes the intermediate scrutiny test, particularly in the context of a facial challenge. New York certainly has a significant interest in the reduction of gun violence, which is the purpose of the CCIA. *See* S51001, Senate Sponsor Memo ("The bill furthers the State's compelling interest in preventing death and injury by firearms"). States have a "substantial, indeed compelling, governmental interest in public safety and crime prevention that undergird the gun licensing laws.'" *Libertarian Party*, 970 F.3d at 128.

Accordingly, the outcome turns on the narrow tailoring prong, which "is satisfied so long as the content-neutral regulation promotes a substantial governmental interest that *would be achieved less effectively absent the regulation*." *Mastrovincenzo*, 435 F.3d at 98 (cleaned up, emphasis in the original). The social media disclosure provision is narrowly tailored to the State's interests. It does not actually restrict speech, only requiring disclosure to the government—and not to any third-parties or the public generally. *See Cornelio*, 32 F.4th at 176 (finding that "it helps the government's case if the disclosure requirement" does not include release of the disclosed information to the public). Moreover, the disclosure requirement is closely circumscribed: it is 1) only triggered by voluntary behavior—a decision to apply for a gun license; 2) only used to determine whether the applicant presents a significant danger of violence; and 3) only requires "a list of former and current social media accounts of the applicant from the past three years." Penal Law § 400.00(1)(o)(iv). And this information directly from the applicant can be used "to confirm" (or, in some cases, contradict) the information furnished by external sources. *Id.* § 400.00(1)(o)(iv).

Plaintiff claims that the social media requirement lacks narrow tailoring because it provides no guidance to licensing officers. But, as discussed above, the disclosure is actually tied to a very

specific dangerousness standard. Penal Law § 400.00(1)(b).[18] The CCIA added this dangerousness standard to the good moral conduct definition, but the Second Circuit already found the significantly broader pre-CCIA version of the standard constitutional and rejected a due process vagueness challenge to it. *Libertarian Party*, 970 F.3d at 127. The Court found the implications of the good moral character standard to be "easily understandable," and that obvious examples of grounds "for denying an applicant's request to possess a firearm" include threats against others or reckless conduct with a weapon while inebriated *Id.* at 126. In short, the standards by which licensing officer will review the social media disclosures are clear, are narrowly tailored to the State's interest in thwarting gun violence and should be upheld.

### C.     The Training Requirements Are Constitutional

The Supreme Court has recognized that "to bear arms implies something more than mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Heller*, 554 U.S. at 617-18 (recognizing that the right to bear arms "cannot exist unless the people are trained to bearing arms"). Unsurprisingly then, 31 shall-issue jurisdictions besides New York require an individual to take a training course to obtain a concealed carry license.[19] The *Bruen* majority acknowledged that shall-issue licensing standards

---

[18] The social media disclosure provision at issue here is significantly narrower than the one considered in *Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022). That case dealt with an ongoing requirement that registered sex offenders disclose any "electronic mail address, instant message address or other similar Internet communication identifier." The latter phrase was so broad that it could potentially sweep in an extraordinary variety of online activity, including private financial transactions. *See id.* at 174-75. New York's requirement, on the other hand, involves only a single disclosure, triggered only by a voluntary application, and is limited only to "social media accounts."

[19] *See* Alaska Stat. § 18.65.705(6); Ariz. Stat. § 13-3112(E)(6); Ark. Stat. § 5-73-309(13); Colo. Stat. § 18-12-203(1)(h)(VI); Conn. Gen. Stat. § 29-28(b); 11 Del. Code Ann. § 1441(a)(3); Fla. Stat. § 190.06(2)(h)(2)-(4); Idaho Stat. § 18-3302K(4)(c); 430 Ill. Stat. § 66/25(6); Iowa Stat. § 724.9; Kan. Stat. 75-7c04(b)(1); Ky. Stat. § 237.110(4)(i); La. Rev. Stat. § 1379.3(D); 25 Maine Stat. § 2003(1)(E)(5); Mich. Stat. § 28.425j; Minn. Stat. § 624.714; Mo. Stat. 571.101(2)(10); Mont. Stat. § 45-8-321(3); Nev. Rev. Stat. § 202.3657(3)(c); N.M. Stat. Ann. § 29-19-4(A)(10); N.C. Stat. § 14-415.12(4) (effective Oct. 1, 2022); Ohio Rev. Code § 2923.125; 21 Okla. Stat. Ann. § 1290.12(A)(2); Or. Rev. Stat. Ann. § 166.291(1)(f); R.I. Gen. Laws § 11-47-16; S.C. Code § 23-31-215(A)(5); Tenn. Code Ann. § 39-17-1366(b)(4)(A); Va. Code § 18.2-308.02(B); W.Va. Code § 61-7-4(e); Wis. Stat. Ann. § 175.60(4); Wyo. Stat. Ann. § 6-8-104(b)(vii).

"often require applicants . . . to pass a firearms safety course." 142 S. Ct. at 2138 n.9.

Contrary to Plaintiff's claims (Pl. Mem. at 11), the number of hours of training that New York requires is not unique or out of step with other jurisdictions, including shall-issue states. *See, e.g.,* 430 Ill. Comp. Stat. 66/75(b) ("at least 16 hours, which includes range qualification time"); Cal. Penal Code § 26165(a)(3), (c) ("up to a maximum of 24 hours" and "shall include live-fire shooting exercises on a firing range"); N.M. Stat. Ann. § 29-19-7A ("not less than fifteen hours in length"); 13 Alaska Admin. Code § 30.070(a)(1)(A) (curriculum must "include[] at least 12 hours of training in the use of handguns . . . including a test of competence with a handgun").

Plaintiff also argues—without citation to any historical or legal authority—that training requirements have never "been a part of, or analogous to, any scheme in use in this country in the 1700s or 1800s." Pl. Mem. at 8. But he is plainly mistaken. At the time of the Founding, and stretching well into the Nineteenth Century, virtually every male citizen was required to serve in the militia, and to train extensively. *See Heller*, 554 U.S. at 596. New York, for instance, required "[t]hat every able-bodied male person, being a citizen of this state, . . and who are of the age of sixteen, and under the age of forty-five years, shall . . . be enrolled . . ." SD ¶ 18. New Yorkers could be required to train up to six times per year. SD Ex. 8; *see also United States v. Miller*, 307 U.S. 174, 181 (1939) (noting that Virginia's militia statute required that "there shall be a private muster of every company once in two months"). Each day's exercises involved a significant commitment of time: New Jersey law, for instance, provided that the militia could be drilled for up to "six hours." SD Ex. 9. In contrast, the CCIA requires only eighteen hours of training—a far cry from the arduous and mandatory training requirements of the Eighteenth and Nineteenth Centuries.

Rather than consider the deep and well-established tradition of training requirements in American history, Plaintiff's moving papers focus instead on allegations about the cost of training,

28

based not on any specific fees or figures, but rather on "estimates" from "[t]he complaint." Pl. Mem. at 10. Plaintiff's Amended Complaint makes clear that these figures conflate multiple different categories (several of which have nothing to do with training), and that they are instead based on Plaintiff's own guesses, which are not competent evidence in support of a preliminary injunction. *See* Am. Compl. ¶¶ 48-49. In any event, requiring individuals to bear the reasonable costs of their firearms training is entirely consistent with this Nation's historical regulations. *Bruen*, 142 S. Ct. at 2126. New York's April 5, 1786 "Act to regulate the militia," for instance, required "[t]hat every citizen . . . shall, within three months [of being enrolled in the militia] provide himself, *at his own expence*, with a good musket or firelock" as well as other equipment. SD ¶ 18 (emphasis added); *Dukakis v. Dep't of Defense*, 686 F. Supp. 30, 33 (D. Mass. 1988) ("[V]irtually every able-bodied man between 18 and 45 was enrolled in the militia and required to arm himself at his own expense."). Plaintiff's unsupported and ahistorical assertions about the cost of training should be rejected.

## IV.  PLAINTIFF HAS NOT MADE A STRONG SHOWING OF IMMINENT AND IRREPARABLE HARM

To show irreparable harm, the moving party must demonstrate that his "injury is neither remote nor speculative, but actual and imminent." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("principle element" of preliminary injunction "is a finding of irreparable harm that is imminent"). Plaintiff fails to make such a showing because the NYPD has not denied his application. And even assuming the NYPD ultimately denies it, the decision will not be made "imminently." In fact, Plaintiff avers just the opposite—that an officer will not review his application until at least January 2023. Pl. Aff. ¶ 6. Moreover, Plaintiff also fails to show that State Defendants caused him imminent, irreparable harm as they are not even reviewing his application.

## V.  THE EQUITIES AND THE PUBLIC INTEREST FAVOR ALLOWING THE CCIA TO PROTECT PUBLIC SAFETY

In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Here, Plaintiff has no plausible claim of injury: his application has not been denied. It is no excuse for him to say that fulfilling the Challenged Requirements is an injury in itself because a plaintiff must submit to the challenged policy to claim a cognizable harm. *Libertarian Party*, 970 F.3d at 121. Conversely, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury,' particularly where there would be 'an ongoing and concrete harm to . . . public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Without the character reference and social media disclosure requirements, more guns may end up in the hands of persons who should not have them; without the training requirements, guns may end up in the hands of persons who are not able to wield them responsibly. These significant public safety concerns weigh strongly against issuing an injunction.

If the Court were to issue a preliminary injunction, State Defendants intend to appeal. They therefore request this Court stay any preliminary injunction pending appeal, or at a minimum, for three business days to allow them to seek emergency relief in the Second Circuit.

## CONCLUSION

For all of the reasons stated above, Plaintiff's renewed motion for a preliminary injunction should be denied, and the Court should grant any further relief to State Defendants that it deems just and proper.

Dated: October 21, 2022

LETITIA JAMES
Attorney General, State of New York
By: _____/S/_____
Todd A. Spiegelman, Assistant Attorney General
(212) 416-8661
Todd.Spiegelman@ag.ny.gov
*Attorney for State Defendants*