**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Jonathan Corbett,

*Plaintiff*

v.

Kathleen Hochul *et al.*,

*Defendants*

Case No. 1:22-CV-5867(LGS)(SDA)

**REPLY TO ALL DEFENDANTS' OPPOSITIONS TO**
**<u>RENEWED MOTION FOR PRELIMINARY INJUNCTION</u>**

I.    **Introduction**

Plaintiff has moved the Court to preliminarily enjoin aspects of New York's gun laws, ECF No. 48, and in opposition, the City Defendants (in ECF No. 63, hereafter "CD") and/or State Defendants (in ECF No. 62, hereafter "SD") argue in sum that: 1) historical analogs to the challenged laws exist sufficient to justify them under the Second Amendments (and that the social media requirement survives First Amendment scrutiny), 2) Plaintiff does not have standing/cannot establish irreparable harm because he does not yet have an injury, 3) injunction would not be in the public interest, and 4) the State Defendants enjoy protection under the Eleventh Amendment.

On the merits, Defendants essentially propose that a tradition of keeping guns out of the hands of dangerous people is sufficient to uphold any means of doing so, but this high-level approach is insufficient to demonstrate a "historical analog."  On the standing issue, state law *requires* that his application, and future renewals, will be denied.  On the remaining issues, the public has a strong interest in the vindication of its constitutional rights[1], and the issue of which defendants are a proper party to this lawsuit is academic because it is undisputed that at least one proper party has been joined as to each claim, and Plaintiff can thus be afforded complete relief.

II.    **Argument**

A.    *A Tradition of "Keeping Guns from Dangerous People" is Too Broad to Satisfy the "Historical Analog" Test*

The State Defendants argue that the social media requirement is analogous to a history of allowing states to conduct an "assessment of dangerousness," and the same is the thrust of their

---

[1] Defendants' arguments on this issue are fully addressed by Plaintiff's opening brief on this motion and thus are not discussed further.

argument regarding the references requirement.  SD, pp. 27-33[2].  The City Defendants make no argument regarding historical analogs as to the social media and references requirement, boldly resting their hat on their arguments as to standing[3].  CD, p. 15, fn. 5.

To be sure, *Bruen* requires a historical analog, not a historical twin.  SD, p. 32, <u>*citing Bruen*</u> at 2133.  But "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*.  Accepting the State Defendants' argument would allow any licensing restriction aimed at preventing dangerous people from getting guns, which is, at least arguably, virtually any restriction whatsoever.  This is not the law according to *Bruen*.  "To justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen* at *13.

Regarding the social media requirement, one could, for example, provide "historical analogues requiring persons to disclose the pseudonyms they have used while publishing political pamphlets or newspaper articles (which might be considered to be akin to requiring the disclosure of all one's social-media accounts)." *Antonyuk v. Hochul*, Case No. 22-CV-0986 at *25 (N.D.N.Y., Oct. 6th, 2022).  A bare assertion that the states kept guns from dangerous people, and that the social media requirement will help New York do that, is wholly insufficient to qualify as a historical analog.  The State Defendants make no attempt to identify a more specific analog, instead resorting to writing about school shootings, which are irrelevant to the inquiry before the Court.

Regarding the references requirement, the State Defendants attempt to posit more specific requirements, but none of these demonstrates a historical tradition.  For example, they first discuss

---

[2] All page numbers for the "CD" and "SD" oppositions refer to ECF-stamped header page numbers, not party-provided footer page numbers.
[3] The City Defendants also boldly fail to discuss the *Antonyuk* cases at all.

English law, which cannot demonstrate historical traditions relevant to this nation unless continued stateside, a prospect for which the State Defendants offer nil.  SD, p. 31.  Next, they discuss this disarming of Catholics, and of disliked preachers.  But to the extent that pair of laws cited amount to a "tradition" of disarming people based on their religion, that tradition is obviously unconstitutional on First Amendment grounds.  And they discuss oath requirements commonly found, but the connection between and a reference is unsupported.  SD, p. 32.

Interestingly, the *Antonyuk* court found another trio of laws relevant, which also suffer from similar defects.  *Antonyuk* at *25, fn. 22.  The first involved a Delaware requirement that "negro[es]" obtain references before they would be afforded gun rights, a requirement that is obviously unconstitutional under the Thirteenth and Fourteenth Amendments, and moreover, did not apply to the vast majority of the residents of that state.  The second involved a Jersey City ordinance, which, standing alone, is unable to support a national historical tradition.  The third involves the City of New York requiring police approval to get a gun license – which is exactly what *Bruen* struck down.

Between the State Defendants and the *Antonyuk* court, all attempts at demonstrating a historical analog have produced restrictions that were either: independently unconstitutional, from a foreign country, or from a single city in New Jersey that, at the time of passing, had a population of less than 100,000 inhabitants.  *Bruen* expressly found British law, absent a reason to connect it to the colonies, is "not sufficiently probative" to demonstrate a tradition.  *Bruen* at 36.  Plaintiff submits that "traditions" that are independently unconstitutional – *e.g.*, because they egregiously discriminated against religion or against racial groups – also cannot form the basis of a "historical tradition," as the Fourteenth Amendment outlawed the use of those traditions by the state at the same time as it made Second Amendment rights enforceable against the states.  We are thus left

with whether the Jersey City Board of Alderman of 1871 alone had the power to create a national historical tradition.  Plainly, they did not.

Absent a historical tradition, Defendants' only hope is the Supreme Court's hint that objective measures limited only to excluding non-law-abiding individuals escape this requirement. Obviously, social media review cannot be done objectively; the government makes little argument there.  But the State Defendants argue that the references requirement is objective because "[t]he licensing officer reviews the disclosures to determine whether an applicant has the good moral character to use a weapon responsibly and not in a dangerous fashion."  SD, p. 27.  The government fails to make its point here: "good moral character" is not something that can be determined on an objective basis (or at least, New York law provides no objective basis).  *See also Antonyuk* at *19, *20.  The social media and references requirement do not qualify for a historical test exception (if the Supreme Court intended to offer one) because they are unambiguously subjective, and the training requirement does not qualify because it is not aimed at non-law-abiding individuals.

B. *Defendants Have Not Demonstrated Any Tailoring of the Social Media Requirement to The Government's Interest*

Regardless of the level of scrutiny[4] used, the thrust of Plaintiff's argument as to the First Amendment issues with the social media requirement is the restriction does not serve the interest because there is no incentive for one with a violent social media presence to disclose its existence, while, on the other hand, the burden on speech is substantial.  Renewed Mot. for PI, pp. 12 – 15.

---

[4] The State Defendants argue that intermediate scrutiny is appropriate because the law is "content neutral."  This ignores the obvious potential for viewpoint discrimination when considering the gun license application because the licensing officer's review is entirely unbounded by objective standards.  In other words, it issues a blank check to the licensing official to find that viewpoints are offensive and deny a license.  Strict scrutiny is appropriate.

The State Defendants describe Plaintiff's argument as speculative, because maybe some people who post school shootings on their social media will be honest about it.  SD, p. 35.  This is about as speculative as suggesting that a bank robber will be unwilling to provide ID for his or her "transaction."  They also suggest that the negative outcomes for honest, law-abiding citizens are "hypothetical," even though Plaintiff provided an affidavit that one of those "hypothetical" outcomes applied to him.  SD, p. 36; Renewed Mot. for PI, Corbett Aff., ¶ 10.  Plaintiff's "hypothetical" "speculations" are common-sense realities; it is obvious that such outcomes will be the result, and whether intermediate or strict scrutiny is applied, the Court must weigh the likely burden against the likely benefit.  Unless the Court believes that the likelihood that someone who posts online they are going to shoot up a school will voluntarily hand over a link to that post while applying for a gun license outweighs the certainty that people will have to share intimate details of their private online history with local police, the government has not met the tailoring requirement and the social media requirement fails First Amendment scrutiny.

Finally, the notion that if the First Amendment allows the government to have similar requirements for *convicted sex offenders,* then it's okay to apply them to gun license applicants, simply does not make the point that the government thinks it is making.  SD, pp. 36, 38.  Gun license applicants should not be treated like sex offenders; they should be treated as Americans exercising their rights.  Nor does it make it better that the disclosure is "only" to the government. SD, p. 37.  Plaintiff thought his application was private, and yet the government here decided to post it to the public docket[5].  Notwithstanding, a government promise to keep the disclosure secret would not remedy the constitutional infirmity of this law.

---

[5] Earlier this week, the City Defendants asked the Court to seal ECF No. 64-1 (excerpts from Plaintiff's gun license application), and the Court did so.  ECF Nos. 65, 66.  What the City Defendants did was to publish to the world a guide to how to rob Plaintiff, putting him (and his

C.  *Defendants Fail to Acknowledge That They Have Created the Most Onerous Training Requirement in the County*

The State defendants write that "the number of hours of training that New York requires is not unique or out of step with other jurisdictions." SD, p. 39. They then go on to discuss laws that either contemplate fewer hours on their face or discuss a *maximum* amount of hours that local officials may require for training. *Id*. For jurisdictions specifying a maximum amount of hours, no argument was made that any jurisdiction actually imposes that maximum.

New York has set a *minimum* of 18 hours of training, which is indeed the most onerous in the country. New York combines this with what is already likely the highest, or near the highest, licensing fees in the country, and possibly also the most time-consuming application process.

The First Amended Complaint estimates 31-37 hours of time and a cost on the order of $1,128.50. Renewed Mot. for PI, pp. 10, 11. The Defendants complain that this is speculative and they need time to ascertain the true numbers. SD, p. 40; CD, p. 20. The idea that the government passed a law without probing what the cost to the public would be is outrageous, but the idea that the government can hire a historian to review centuries of gun law tradition but cannot figure out how much it will cost to complete the license and training is simply not credible. If the government wants to dispute Plaintiff's estimates, it could have, and should have, provided its own. City Defendants may lament absence of "a test by which to determine when a fee would be so exorbitant as to constitute a denial of the right to carry;" CD, p. 19; Plaintiff submits that if your fee and time

---

employees) in serious danger and requiring substantial alterations to his business and security practices to mitigate the possibility that bad actors may have accessed the filing before the Court ordered it sealed. The danger that the disclosure of one's statement of "proper cause" may create would be obvious to anyone who read the document published, and Plaintiff cannot conceive of a way this could have been a mere accident. The proper cause statement is also entirely irrelevant, since "proper cause" no longer exists as a requirement. This was a shameful tactic.

burden is the most demanding in the country, as a result of a law designed to circumvent a Supreme Court mandate, you are probably on the wrong side of whatever that test may be.

Realizing that their training requirements are indeed onerous, the government compares them to military training and to obtaining a driver's license.

As to the former, the government attempts to frame mandatory military service as the olden-day version of pre-licensure gun training.  SD, p. 39; CD, p. 19.  This fails, among other reasons, because the requirements only applied to able-bodied, male citizens of the state in a certain age range.  *Id*.  The government ignores that women could indeed procure firearms, that disabled people could procure firearms, that people below the age of conscription could procure firearms, that citizens who moved to the state after the maximum conscription age could procure firearms, and that non-citizens present within the state could procure firearms.  The military training that the State Defendants speak of was for the purpose of *training the military*, not for the purpose of ensuring gun safety.

As to the latter, the fact of the matter is that cars are far more complex to operate, and require far more training to operate, than guns – and are far more likely to kill someone.  Learning how to safely load/unload, shoot, clean, and store a handgun is a process that takes a few hours at most.  Learning how to drive a vehicle is a process that takes dozens of hours of practice.  Laws regarding pre-driver license training are reasonably related to the difficulty and risk presented by driving a car; the new training requirements for gun licensees are not.

Finally, the City Defendants' argument that training requirements do not burden the plain text of the Second Amendment border on the absurd.  CD, p. 18.  Plaintiff cannot keep or bear a firearm in New York at all without completing the required training.  Plaintiff appreciates what

surely must be the City Defendants' attempt at humor when they write that, "such restrictions enhance, rather than burden, Second Amendment rights because one cannot truly experience the benefits of gun ownership if unable to safely operate the firearm," CD, p. 17, but jokes notwithstanding, when a license is required to keep and bear arms, a restriction on obtaining that license necessarily burdens the Second Amendment.

    D.  *Plaintiff Has a Present Constitutional Injury*

At the outset, Defendants use the same arguments to allege that Plaintiff lacks standing due to having no present injury, to allege that Plaintiff is in danger of no irreparable harm, and to allege that the balance of equities tip in its favor. We may address these issues simultaneously.

The argument presented by Defendants comes in three flavors: first, that the social media and references requirements do not apply to his application because he submitted the application before the effective date of the statute; second, that his application has not yet been denied (SD, pp. 41), and third, that Plaintiff could prevent denial by voluntary compliance (SD, pp. 23, 41).

As to the first flavor, the law does provide that applications "made" before September 1st, 2022 are not subject to the social media and training requirements. N.Y. Penal Law § 400.00(1)(o)(ii). But, is an application "made" when it is dropped onto a desk in the Licensing Division, or is it "made" when processing begins? If the latter, Plaintiff has averred that there are no indicia that processing of his application has begun, and has the oral statement of a licensing officer that it would not begin for months. Renewed Mot. for PI, Corbett Aff., ¶¶ 6, 7.

Regardless, as at least the City Defendants acknowledge, Plaintiff will certainly be subject to these requirements upon license renewal. CD, p. 12, fn. 4. The City Defendants downplay this eventuality as distant and "hypothetical," but the fact of the matter is that a chilling effect starts

now: should Corbett go through an 18-hour training course, pay over $1,000 in fees, subject himself to the other rigors of the licensing process, and go through the expense of buying a gun, under the cloud that three years from now, he will have to surrender that license and gun and the whole process will be for naught?  Plaintiff has already put money into the application process and, before processing that application, the state changed the rules.  Plaintiff thus has an injury, whether the symptoms of the injury will manifest with this application or with a renewal application.  *See also* Corbett Reply Aff., ¶ 2 (intent to renew for life).

As to the second flavor, the City Defendants in particular feel Plaintiff should wait until his license is denied.  Recognizing that such a requirement does not exist when it is a foregone conclusion that the license would or must be denied, *i.e.*, that waiting is futile, they argue that "Corbett does not allege futility."  CD, p. 13.  This is not a fair reading of Plaintiff's motion nor of the law.  The social media and references requirements are mandatory; under the text of the law, the licensing officer is not given discretion to waive them. *Antonyuk* at *15-16 (application would be futile).  Plaintiff has unequivocally alleged that he will not comply with these sections of the law.  Renewed Mot. for PI, Corbett Aff., ¶¶ 10 – 12. As to the training, the City Defendants point to a new modification of the law allowing the licensing officer discretion to accept training courses taken in the last 5 years.  CD, p. 14.  However, Plaintiff has not taken a training course in the last 5 years. Corbett Reply Aff., ¶ 3.

And as to the third flavor, if the possibility of voluntary compliance with a challenged law were enough to defeat a claim, there would be no way to challenge any law other to be fined or imprisoned for non-compliance.  It is black letter law that Plaintiff need not break a law in order to challenge it, and this argument was squarely rejected by the *Antonyuk* court.  SD, p. 24, fn. 10.

E.  *A Proper Party Has Been Named as a Defendant for Each Claim*

- 10 -

Plaintiff seeks a preliminary injunction[6] to put a state law on hold.  Named in the case are six city and state officials, and it is indisputable that at least one of them is a proper defendant for each of the laws challenged.  It is, therefore, indisputable that the Court can grant the relief requested in this motion because it makes no difference which official is nominally enjoined: the effect – a stay of state law – is exactly the same[7].

Legal strategy aside, the *Antonyuk* court dealt with this issue elegantly: "With regard to the State Defendants' argument that Defendants Hochul, Bruen and Doran are improper Defendants, the Court finds that, although the Court certainly may ultimately find that Defendant Hochul is not a proper party, that issue is more appropriately left for consideration on a more-fully briefed motion for a preliminary injunction; and Plaintiffs have alleged and shown their injuries to be fairly traceable to Defendants Bruen and Doran. Defendant Bruen is a proper Defendant." *Antonyuk* at *15.  Although here we have a fully-briefed motion for a preliminary injunction, the defendants have indicated that they intend to file motions to dismiss, and it is at that time that their issue would be best heard.  It is simply not necessary to decide in order to determine if preliminary relief should issue.

### III.   <u>Conclusion</u>

"Simply stated, instead of moving toward becoming a shall-issue jurisdiction, New York State has further entrenched itself as a shall-not-issue jurisdiction." *Antonyuk* at *21.

---

[6] Defendants insist that the relief requested is a "mandatory injunction."  But that is based on an interpretation of "status quo" which allows them to change a law and then say, "well this is the status quo!"  In this circuit, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2ⁿᵈ Cir. 1994).

[7] It is surprising that the State Defendants continue to raise this issue, because a successful argument would mean not that the case ends, but only that the New York City Law Department is tasked with defending a state law of high political value to the Governor instead of her own Attorney General.

Dated:  New York, NY

       October 28th, 2022

Respectfully submitted,


_____/s/Jonathan Corbett_____

Jonathan Corbett, Esq.
Plaintiff (attorney proceeding *pro se*)
CA Bar #325608
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:   (310) 675-7080
